# United States Court of Appeals
## For the First Circuit

No. 13-1881

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL ARNOTT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Thompson and Selya, Circuit Judges,
and McConnell,* District Judge.

Peter J. Cyr and Law Offices of Peter J. Cyr on brief for appellant.
Thomas E. Delahanty II, United States Attorney, and Renée M. Bunker, Assistant United States Attorney, on brief for appellee.

July 2, 2014

*Of the District of Rhode Island, sitting by designation.

**SELYA, Circuit Judge.** After the district court denied his motion for suppression, defendant-appellant Paul Arnott entered a conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), reserving his right to challenge the suppression ruling. Following the imposition of sentence, the defendant acted upon this reservation and appealed. Having given the matter due consideration, we affirm.

## I. BACKGROUND

We rehearse the facts as found by the district court (explicitly or implicitly) at the suppression hearing, consistent with record support. See United States v. Gonzalez, 609 F.3d 13, 15 (1st Cir. 2010).

This case has its genesis in a court order issued on November 16, 2011, which authorized a wiretap on a cellular telephone in the possession of James Brichetto (a suspected drug peddler). Between November 16 and December 28, federal agents overheard a host of drug-related conversations between Brichetto and his customers. During the same period, officers surveilled in real time an assortment of drug deals in which Brichetto was involved.

On December 28, agents intercepted a call between Brichetto and a potential customer, Michael Leavitt, in which Leavitt sought to purchase approximately 100 oxycodone pills. Brichetto asked whether Leavitt was with someone else, and Leavitt

responded affirmatively. As the conversation wound down, Brichetto and Leavitt agreed to meet in the parking lot of a Walmart store in Scarborough, Maine.

Officer Joshua Guay, a member of the Scarborough police force seconded to work with a Drug Enforcement Administration task force, witnessed the meeting. Brichetto arrived in a silver truck that had been seen during previous drug deals. He parked next to a Saturn sedan. A passenger, later identified as Leavitt, left the Saturn and got into Brichetto's truck. After a few minutes, Leavitt returned to the Saturn. Both vehicles then departed.

Officer Guay trailed the Saturn and notified a fellow Scarborough police officer, Tim Dalton, that what appeared to have been a drug deal had been consummated. Although Officer Guay believed that sufficient grounds existed to stop the Saturn based on what he knew and had seen, the investigation of Brichetto's operation was continuing and the officer was concerned about prematurely disclosing the existence of the wiretap. Thus, he asked Officer Dalton to try to find a traffic-related reason to stop the car. This request proved to be superfluous; Officer Guay saw the Saturn roll through a stop sign and, when he relayed this information to Officer Dalton, the latter initiated a traffic stop.

After arranging for backup, Officer Dalton approached the Saturn and demanded identification from both the driver (the defendant) and the passenger (Leavitt). Leavitt tried to pass

-3-

himself off as "William Young" and professed not to have any identification on his person. The defendant, though exhibiting an extraordinary level of anxiety, handed over his driver's license. In response to questions, he gave vague answers.

Officer Dalton directed the defendant to leave the vehicle and conducted a pat-down for weapons.[1] He felt a hard object in the defendant's pocket, which he suspected was a knife. Queried about how to access the pocket, the defendant unzipped it. Officer Dalton reached into the pocket and removed a bag of tightly wrapped blue pills that the defendant admitted were oxycodone.

When queried about other drugs in the car, the defendant replied that the trunk contained a quarter pound of marijuana. Next, Officer Dalton handcuffed the defendant and escorted him to the patrol car. To that point, no Miranda warnings had been given. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

In due course, a federal grand jury indicted the defendant on one count of conspiracy to possess and distribute oxycodone, see 21 U.S.C. §§ 841(a)(1), 846, and one count of possession of oxycodone with intent to distribute, see id.

---

[1] The government suggests in passing that the defendant may have consented to this pat-down. A valid consent would vitiate the defendant's Fourth Amendment challenge to the pat-down. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003). Because we find the pat-down lawful on other grounds, see text infra, we do not probe this point.

§ 841(a)(1).[2]  The defendant moved to suppress both the drugs seized during the traffic stop and his incriminating roadside statements.  The government opposed the motion.

The district court conducted an evidentiary hearing and thereafter refused to suppress any evidence.  In its bench decision, the court ruled that both the stop and the search were justified because the police had probable cause to believe that the defendant had committed a drug-trafficking offense.  The court further ruled that Officer Dalton was not obligated to give the defendant Miranda warnings before handcuffing him because the questioning up to that point was non-custodial.

Following the defendant's conditional guilty plea to the substantive offense charged in the indictment[3] and the imposition of sentence, the defendant appealed.

## II.  DISCUSSION

When reviewing the district court's disposition of a motion to suppress, we accept the court's findings of fact unless they are clearly erroneous.  See United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001).  Conversely, we assay the court's legal conclusions, including its answers to "the ultimate questions of

----

[2] For aught that appears, no federal charges were brought against the defendant with respect to the marijuana found in his car.

[3] As part of the conditional plea agreement, the government voluntarily dismissed the conspiracy charge.

-5-

reasonable suspicion and probable cause to make a warrantless search," de novo. Ornelas v. United States, 517 U.S. 690, 691, 699 (1996). In applying these standards of review, we take the record evidence in the light most favorable to the suppression ruling. See United States v. McGregor, 650 F.3d 813, 823-24 (1st Cir. 2011); United States v. Owens, 167 F.3d 739, 743 (1st Cir. 1999). Lastly, we are not wed to the district court's reasoning but, rather, may affirm its suppression rulings on any basis apparent in the record. See United States v. Doe, 61 F.3d 107, 111-12 (1st Cir. 1995).

We begin with a few words of explanation: although we reach the same destination as the district court, we get there by a somewhat different route. The district court engaged in a probable cause analysis. This analysis, though likely supportable, elevates the bar higher than necessary. In our view, this case can appropriately be treated as a Terry stop, see Terry v. Ohio, 392 U.S. 1, 19-20 (1968), which requires only reasonable suspicion as a predicate for the officer's actions.

It is common ground that a traffic stop constitutes a seizure of both the stopped vehicle and its occupants for Fourth Amendment purposes. See Chhien, 266 F.3d at 5. Consequently, a traffic stop must satisfy a standard of objective reasonableness. See Terry, 392 U.S. at 19; United States v. Ruidíaz, 529 F.3d 25, 28-29 (1st Cir. 2008).

The objective reasonableness of a <u>Terry</u> stop must be gauged in two phases. The police are not allowed to make an initial stop unless they have a reasonable, articulable suspicion about an individual's involvement in some criminal activity. <u>See</u> <u>Terry</u>, 392 U.S. at 21; <u>Chhien</u>, 266 F.3d at 6. If the initial stop passes muster, actions undertaken during the course of the stop "must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation." <u>Ruidíaz</u>, 529 F.3d at 28-29 (internal quotation marks omitted).

The standard of reasonable suspicion is protean and case-specific. Reasonable suspicion requires more than a naked hunch, <u>see</u> <u>United States</u> v. <u>Sokolow</u>, 490 U.S. 1, 7 (1989), but less than probable cause, <u>see</u> <u>Chhien</u>, 266 F.3d at 6. In the broad expanse between these two poles, the court's assessment must be made in light of the totality of the circumstances. <u>See</u> <u>United States</u> v. <u>Romain</u>, 393 F.3d 63, 71 (1st Cir. 2004). The totality of the circumstances includes, but is not limited to, "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." <u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 418 (1981).

In the last analysis, reasonable suspicion is more a concept than a constant: it deals with degrees of likelihood, not with certainties or near certainties. It makes due allowance for

-7-

the need for police officers to draw upon their experience and arrive at inferences and deductions that "might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Cortez, 449 U.S. at 418). By like token, an appraisal of an officer's conduct after the initial Terry stop necessarily entails an element of flexibility: the officer "may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." Chhien, 266 F.3d at 6.

With these jurisprudential stanchions in place, we move from the general to the specific. In the first instance, the defendant challenges the reasonableness of both the initial traffic stop and the subsequent pat-down.[4]

We need not linger long over the initial stop. Agents monitored Brichetto's nefarious activities for several weeks. During this interval, the structure of many of Brichetto's drug deals closely paralleled the events of December 28, 2011. A pattern was readily evident, and Officer Guay (a 12-year veteran) himself had observed Brichetto-inspired deals that fit into this pattern. The intercepted telephone calls, the repeated surveillances, the evident pattern, and Officer Guay's December 28

---

[4] Because it is not necessary for us to consider the existence vel non of probable cause, see text supra, we do not reach the defendant's challenge to the district court's probable cause determination.

-8-

observations in the Walmart parking lot yielded ample reason to suspect that the Saturn's occupants had just participated in a drug deal. That constituted reasonable suspicion adequate to justify stopping the Saturn.[5] See, e.g., Ruidíaz, 529 F.3d at 30.

This brings us to the validity of the frisk. Although the district court made no express findings on this point, we must view the record and the reasonable inferences extractable therefrom in the light most favorable to the court's suppression ruling. See McGregor, 650 F.3d at 823-24; Owens, 167 F.3d at 743.

The defendant claims that the frisk was improper because Officer Dalton lacked any reason to suspect that the defendant presented a danger. The officer's assertions to the contrary, the defendant argues, were merely a pretext to enable him to conduct an evidentiary search.

We think that the defendant protests too much. The totality of the circumstances gave Officer Dalton reasonable grounds to suspect that the defendant might be dangerous. The defendant appeared unduly nervous when questioned; his hands were shaking so badly that he could scarcely hold out his driver's license. Moreover, the police had strong reasons to believe that

---

[5] To be sure, Officer Guay witnessed the Saturn roll through a stop sign; and that traffic infraction provided an independently sufficient ground for stopping the car. See New York v. Class, 475 U.S. 106, 125 (1986); McGregor, 650 F.3d at 822. Inasmuch as the district court did not see any need to rely on this circumstance, we set it to one side.

the occupants of the Saturn (one of whom carried no identification) had just concluded a drug-related transaction. The connection between drugs and violence is, of course, legendary. See, e.g., United States v. Randle, 815 F.2d 505, 508 (8th Cir. 1987).

In these circumstances, Officer Dalton's apprehension of danger was reasonable. Thus, he had an adequate security-related ground to pat the defendant down for weapons. See Terry, 392 U.S. at 30.

Seizing the oxycodone pills as part of the search was also reasonable. Officer Dalton felt a hard object in the defendant's coat and reasonably concluded that it resembled a knife. He was, therefore, within his rights to remove the object from the defendant's pocket. See, e.g., Michigan v. Long, 463 U.S. 1032, 1050 (1983) (holding that contraband discovered during a legitimate search for weapons need not be suppressed under the Fourth Amendment).

The defendant's reliance on Minnesota v. Dickerson, 508 U.S. 366 (1993), is misplaced. There, the Court affirmed the suppression of cocaine discovered by an officer only after "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket — a pocket which the officer already knew contained no weapon." Id. at 378 (internal quotation marks omitted). No remotely comparable circumstances existed here.

The next claim of error questions whether the defendant's inculpatory roadside statements warranted suppression. The court below thought not, and we agree.

At their inception, <u>Terry</u> stops generally do not require <u>Miranda</u> warnings. <u>See</u> <u>United States</u> v. <u>Teemer</u>, 394 F.3d 59, 66 (1st Cir. 2005); <u>United States</u> v. <u>Streifel</u>, 781 F.2d 953, 958 (1st Cir. 1986). Instead, they afford officers some latitude to question witnesses about issues for which the officers have reasonable suspicion. <u>See</u>, <u>e.g.</u>, <u>Chhien</u>, 266 F.3d at 9-10. Here, the questions posed by Officer Dalton were directly tied to his legitimate discovery of contraband on the defendant's person. Thus, the questioning did not approach (let alone cross) the outer bounds of a <u>Terry</u> stop.

Nor can we fault the district court's determination that Officer Dalton's roadside questioning of the defendant was non-custodial. During the brief period of interrogation, the defendant had been neither arrested nor restrained. He was on a public roadway and was being quizzed by a single officer who made no show of force. The district court's finding that the interrogation was non-custodial is, therefore, unimpugnable.[6] <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Jones</u>, 187 F.3d 210, 218 (1st Cir. 1999).

---

[6] We add a coda. The defendant's brief is enigmatic about which statements he believes should have been suppressed. Given this lack of specificity, any claim of error relating to the statements may well be waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

**III. CONCLUSION**

We need go no further.  For the reasons elucidated above, we uphold the district court's denial of the motion to suppress.


**Affirmed**.