# United States Court of Appeals
## For the First Circuit

No. 15-2192

UNITED STATES OF AMERICA,

Appellee,

v.

KING BELIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Selya, and Kayatta,
Circuit Judges.

Paul J. Garrity for appellant.
Kunal Pasricha, Assistant United States Attorney, with whom
William D. Weinreb, Acting United States Attorney, was on brief,
for appellee.

August 22, 2017

**KAYATTA**, <u>Circuit Judge</u>.  King Belin was convicted at trial of being a felon in possession of a firearm and sentenced to seventy-one months' imprisonment.  He raises two issues on appeal: whether there was reasonable suspicion for the stop-and-frisk that resulted in the discovery of the firearm, and whether the district court erred by allowing him to direct his attorney not to pursue certain factual lines of defense at trial.  We conclude that the stop-and-frisk was lawful and that the district court did not err in the way it resolved Belin's dispute with his attorney.

**I.**

**A.**

As is customary when reviewing the denial of a motion to suppress, we recount the facts as found by the district court, consistent with record support.  <u>See</u> <u>United States</u> v. <u>Romain</u>, 393 F.3d 63, 66 (1st Cir. 2004).

At 6:45 P.M. on September 17, 2012, the Boston Police Department radio broadcast a call that a fight involving either kids or girls had broken out at the intersection of Norfolk Street and Fessenden Street near Norfolk Park in Mattapan, a Boston neighborhood.  Norfolk Park had been the site of multiple recent firearms arrests and incidents.  Two Boston Police Department officers, Officer Bissonnette and Officer Finn, responded to the call.  They drove to the location and saw a group of five men walking down the sidewalk of Norfolk Street toward Fessenden Street

and Norfolk Park. They pulled over in front of the group of men where the sidewalk dips to allow pedestrians to cross the street, so that their car blocked the crosswalk. As the officers got out of the car, one of the men, Belin, peeled off from the others and hurried away from the officers, crossing the street toward Norfolk Park.

Bissonnette recognized Belin. He had arrested Belin in 2009 about half a mile away from Norfolk Park for having a firearm in his car without a license. He also knew that Belin was listed in a police database as a member of a local gang, the Norfolk Street Bulls. Belin was wearing a heavy black hooded sweatshirt that was "not tight-fitting." The temperature that evening hovered just below seventy degrees Fahrenheit. One person in the park at the time was wearing a "light parka"; another was wearing a t-shirt. Bissonnette also wore a t-shirt.

Bissonnette followed Belin and said, "Yo, King, what's going on?" Belin looked at him, half-smiled, and continued walking. Bissonnette caught up to Belin, who stopped and turned around.[1] Bissonnette asked if Belin had anything on him. Belin became unusually nervous, his demeanor and facial expression

---

[1] The district court did not find this fact, but the sequence of events does not make sense without it. We include it here because this part of Bissonnette's testimony was undisputed and unchallenged, and the district court generally credited his testimony.

changed, he took a deep breath, and then his breathing became quick and shallow. He looked around "as if searching for a means of escape."

Bissonnette grabbed one of Belin's arms with one hand and reached toward Belin's waist with the other to frisk his waistband. Both of Belin's hands moved toward his waist, and Bissonnette grabbed them. A struggle ensued, other officers came to help, and they took Belin to the ground. After Belin was handcuffed, the officers searched him and discovered a gun, marijuana, and five rounds of ammunition. Belin moved to suppress the results of the search, arguing that the stop-and-frisk occurred without reasonable suspicion that he was armed and dangerous. The district court denied the motion, and Belin appeals that denial.

**B.**

Although we have summarized the facts as found by the district court and as supported by the record viewed "in the light most favorable to the district court's ruling," United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011) (quoting United States v. Soares, 521 F.3d 117, 118 (1st Cir. 2008)), "we review de novo the district court's conclusions of law, including its application of the law to the facts, its probable cause and reasonable suspicion determinations, and the district court's ultimate legal decision to grant or deny the motion to suppress," id. at 724 (emphasis omitted). We also review de novo the court's legal

- 4 -

conclusion about at what point the facts amounted to a seizure.
See United States v. Taylor, 511 F.3d 87, 91 (1st Cir. 2007).

The parties disagree on four points, each of which we must resolve to decide this appeal:  (1) when the stop occurred; (2) whether there was reasonable suspicion for the stop; (3) when the frisk occurred; and (4) whether there was reasonable suspicion for the frisk.  For the following reasons, we agree with the district court that the stop occurred when Bissonnette put his hand on Belin's arm, that the stop and the frisk occurred simultaneously, and that there was reasonable suspicion sufficient to justify the frisk (and thus, in this case, the stop as well).

**1.**

This case involves a seizure short of a formal arrest known as a "Terry stop," after Terry v. Ohio, 392 U.S. 1 (1968). See id. at 16 (holding that a Fourth Amendment seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away").  "The police need not have taken physical custody of a person in order to be deemed to have effected a Terry stop for which at least reasonable suspicion is required."  United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016).  "Such a stop instead may occur merely upon law enforcement making what the Supreme Court has termed a 'show of authority.'"  Id. (quoting United States v. Mendenhall, 446 U.S. 544, 553–54 (1980) (opinion of Stewart, J.)).  "Such a 'show of authority' occurs, however,

- 5 -

only when 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  Id. (quoting Mendenhall, 446 U.S. at 554 (opinion of Stewart, J.)).

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

Mendenhall, 446 U.S. at 554 (opinion of Stewart, J.)[2]; see also Fields, 823 F.3d at 25 (relying on these examples); United States v. Ford, 548 F.3d 1, 5 (1st Cir. 2008) (adopting and supplementing the list in Mendenhall).  "[W]ith respect to a seizure based upon an officer's show of authority, no seizure occurs until the suspect has submitted to that authority."  United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994) (citing California v. Hodari D., 499 U.S. 621, 626 (1991)).

We observe, initially, that Bissonnette testified that he resolved to "search" Belin immediately upon recognizing him. The applicable test, however, focuses not on the officer's intent, but rather on the objective manifestations of authority as

---

[2] This language appears in a section of Mendenhall in which Justice Stewart was writing only for himself and Justice Rehnquist. See 446 U.S. at 546 n.**, 551–57.

discerned by a reasonable person in the position of the defendant.[3] See Fields, 823 F.3d at 25. Bissonnette's intent thus does not control, although it certainly could have been considered by the district court in resolving any factual disputes concerning exactly what Bissonnette did and how he came across to Belin.

Properly focusing on what the district court found that Belin saw, heard, and felt, Belin argues that the show of authority manifesting a Terry stop occurred when Bissonnette approached him, which caused him to stop and answer Bissonnette's questions. We have little doubt that many reasonable people would feel it appropriate to stop and answer an officer's questions in such a situation. The police, however, are entitled to approach people and ask questions without always being deemed to have ordered a stop. See Mendenhall, 446 U.S. at 553 (opinion of Stewart, J.) ("Police officers enjoy 'the liberty (again, possessed by every citizen) to address questions to other persons,' although 'ordinarily the person addressed has an equal right to ignore his interrogator and walk away.'" (quoting Terry, 392 U.S. at 31, 32–33 (Harlan, J., concurring))). "The 'free to leave' test thus focuses on whether the conduct of law enforcement 'objectively communicate[s] that [law enforcement] is exercising [its] official authority to restrain the individual's liberty of movement.'"

_____

[3] Belin makes no argument that his race played a role in Bissonnette's decision to conduct the stop-and-frisk.

<u>Fields</u>, 823 F.3d at 25 (alterations in original) (emphasis omitted) (quoting <u>United States</u> v. <u>Cardoza</u>, 129 F.3d 6, 16 (1st Cir. 1997)); <u>see also</u> <u>Hodari D.</u>, 499 U.S. at 628 ("<u>Mendenhall</u> establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.").

This court has concluded that no seizure occurred in situations with greater shows of authority than were manifest here before Bissonnette touched Belin. <u>See, e.g.</u>, <u>Fields</u>, 823 F.3d at 27 (holding no seizure occurred where, after asking defendant investigatory questions, the police officer called for backup and four other police officers arrived); <u>United States</u> v. <u>Smith</u>, 423 F.3d 25, 30 (1st Cir. 2005) (holding no seizure occurred where police officers approached and stood on either side of defendant, who was sitting on a wall, as they questioned him). Based on this controlling precedent and the district court's factual findings concerning the events in question, we cannot conclude that Bissonnette had objectively communicated the use of his official authority to restrain Belin until he grabbed Belin's arm. <u>See</u> <u>United States</u> v. <u>Zapata</u>, 18 F.3d 971, 977 (1st Cir. 1994) (stating that seizure occurred once officer touched the defendant's arm). Prior to that point, he had acted on his own, he had not touched his weapon, he had not touched Belin, and he had not given any

orders or made any threats. Cf. Mendenhall, 446 U.S. at 554 (opinion of Stewart, J.). Moreover, the district court did not find that Bissonnette chased after Belin, which might have contributed to a show of authority. Cf. Hodari D., 499 U.S. at 629 (assuming that chasing after a suspect on foot is a show of authority, but finding no seizure because defendant did not yield to that show of authority).

**2.**

We consider next when the frisk occurred. The district court noted that the stop-and-frisk "seem to be collapsed into one moment, or certainly they occurred closely, one after another." Accordingly, its conclusion that Bissonnette had reasonable suspicion for the frisk rests entirely on events up to the point when Bissonnette grabbed Belin's arm. On appeal, Belin's argument that reasonable suspicion was lacking is based entirely on the facts up to that point as well. The government, by contrast, argues that the frisk did not commence until after Bissonnette's hand touched Belin's waist area, which did not occur until after Belin had already made several incriminating movements.

Specifically, the government contends that although Bissonnette simultaneously reached toward Belin's waist and grabbed Belin's arm, Belin prevented Bissonnette from actually touching his waist. Therefore, in the government's view, the frisk

of the waist did not occur until after Belin had been tackled to the ground and had repeatedly reached toward his waistband.

We do not accept the government's argument. The district court did not make any detailed findings about the location of Bissonnette's and Belin's hands because the government did not make this argument in its memorandum below. At most, the government alluded to the argument at the suppression hearing but did not actually assert that the frisk occurred only after the police had tackled Belin to the ground. Although we may affirm on any ground apparent from the record, see United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014), the lack of factual findings on the exact temporal sequence of arm movements by Bissonnette and Belin means that this potential ground for affirmance is not apparent. We will not consider it. Rather, we presume (as Belin urges) that the district court correctly found that the frisk, like the stop, commenced when Bissonnette grabbed Belin's arm.

**3.**

We turn next to determining whether there was reasonable suspicion for the stop-and-frisk. In Terry, the Court held that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial

- 10 -

> stages of the encounter serves to dispel his
> reasonable fear for his own or others' safety,
> he is entitled for the protection of himself
> and others in the area to conduct a carefully
> limited search of the outer clothing of such
> persons in an attempt to discover weapons
> which might be used to assault him.

Terry, 392 U.S. at 30.

In general, this court assesses the constitutionality of a stop and a frisk separately. "It is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat-frisks has been met." United States v. Cardona-Vicente, 817 F.3d 823, 827 (1st Cir. 2016) (quoting United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005)). "[I]n determining whether a pat-down search is an appropriate step following a valid Terry stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" Id. (alteration in original) (quoting United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)); see also Adams v. Williams, 407 U.S. 143, 146 (1972) ("The purpose of [a frisk] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ."); 4 LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.6(a) (5th ed. 2012 & Supp. 2016) ("[T]he officer would . . . have to establish . . . that there was a substantial possibility that the suspect possessed items which could be used for an attack and that he would so use them."). "To

- 11 -

assess the legality of a protective frisk, a court looks at the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion." Cardona-Vicente, 817 F.3d at 827 (quoting McKoy, 428 F.3d at 39).

Sometimes, however, the reasonable suspicion of a crime that justifies a stop will also justify a frisk because the very nature of the crime poses a sufficient risk that the stopped individual is armed and dangerous. Pointing to Justice Harlan's concurrence in Terry, 392 U.S. at 33, we have observed that "[w]hen the officer suspects a crime of violence, the same information that will support an investigatory stop will without more support a frisk." United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001). Our holding in United States v. Pontoo, 666 F.3d 20 (1st Cir. 2011), provided an easy vehicle for finding such an association. The officer conducting the Terry stop reasonably suspected the defendant of a very recent murder. Id. at 30-31. That was enough, we held, to warrant a pat-down for weapons as well. "In cases in which the individual stopped is suspected of having just committed a murder, it is reasonable for an officer to conclude that [the individual] may be armed and dangerous." Id. at 30.

We have also extended this type of reasoning to certain crimes that we pronounce are "associated with" violence. For example, we have observed that in the case of suspected "large-scale trafficking in illegal drugs," "the same information that

- 12 -

will support an investigatory stop will without more support a frisk." Scott, 270 F.3d at 41. And we have applied this reasoning to suspected cases of street-dealer-level transactions, at least where the suspect also appeared unusually anxious at the time of the stop. See Arnott, 758 F.3d at 45; United States v. Ivery, 427 F.3d 69, 70-71, 73 (1st Cir. 2005); United States v. Gilliard, 847 F.2d 21, 25 (1st Cir. 1988). As justification, we noted that "[t]he connection between drugs and violence is . . . legendary." Arnott, 758 F.3d at 45. At the other end of the spectrum, we have found that suspected fraud in the form of passing a bad check is not the type of crime that, without much more, will generate sufficient grounds for a frisk. See Scott, 270 F.3d at 41-42.

Here, the suspected crime purportedly justifying the stop was the unlawful possession of a firearm. In deciding whether a particular crime is sufficiently associated with a risk of violence to justify a frisk, we would ideally have access to empirical data to measure the extent of the association. Rarely, though, do courts seem to receive such information. We therefore rely on our (largely unscientific) observations and experiences and on comparisons with our (also non-empirical) classifications of other crimes. Although such an approach might seem dubious in many circumstances, in the instance of this particular crime-- illegal possession of an instrument designed precisely to cause serious harm--we can be reasonably confident in our conclusion.

- 13 -

Simply put, if an officer reasonably suspects a lawfully stopped, unusually nervous individual of unlawfully possessing a firearm, the officer need not simply hope that the firearm will not be used. Rather, to be unusually nervous and reasonably suspected of being armed unlawfully when stopped is to be reasonably viewed as dangerous enough to justify a frisk.[4]

This conclusion means that, in this case, the lawfulness of the frisk and the lawfulness of the stop turn on the answer to a single question: Did the facts leading up to the simultaneous stop-and-frisk make it "reasonabl[e] to conclude" that Belin was both unusually nervous and in possession of a firearm? Terry, 392 U.S. at 30.

Although the issue is close and we are not free of doubt, we find that the facts support such a conclusion. Bissonnette knew that Belin had previously carried a firearm unlawfully, and that he was listed as a member of the Norfolk Street Bulls gang in a police database, the accuracy of which Belin does not challenge. See United States v. Am, 564 F.3d 25, 32 (1st Cir. 2009) (criminal history and gang affiliation may contribute to reasonable suspicion); United States v. Kimball, 25 F.3d 1, 7 (1st Cir. 1994) (similar); cf. United States v. McGregor, 650 F.3d 813, 822–23

_____

[4] On the facts of this case, we need not decide whether we would reach the same conclusion about a person reasonably suspected of illegally possessing a firearm who was not unusually nervous.

- 14 -

(1st Cir. 2011) (holding that "[i]n sizing up the whole situation, the officers could consider all the men's criminal doings and gang associations," even old ones).  The area in which the interaction occurred was specifically identified as an area fraught with gun offenses.  See United States v. Dapolito, 713 F.3d 141, 149 (1st Cir. 2013) (fact that area is known for a particular type of crime may contribute to reasonable suspicion for that crime); United States v. Wright, 485 F.3d 45, 53–54 (1st Cir. 2007) (same).  But see Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").  In addition to not stopping, as he was entitled to do, Belin also left his companions and sped up his attempted exit from the scene when he saw the police.[5]  Cf. Wardlow, 528 U.S. at 124 (stating that "nervous, evasive behavior" may be relevant to reasonable suspicion); United States v. Hart, 674 F.3d 33, 38–39 (1st Cir. 2012) (similar).  During the interaction, but before the stop-and-frisk, Belin became nervous.  The district court found that this was "not the normal nervousness that accompanies being spoken to by a police

---

[5] We assign no weight to Belin's initial failure to stop (as opposed to the hurried peeling off from the group).  Otherwise, we would create a catch-22:  if he stopped voluntarily, it would not have been a police-ordered stop, but because he did not stop voluntarily, the officer could for that reason stop him.

officer." Nor was its onset coincident with being approached by Bissonnette. Cf. McKoy, 428 F.3d at 40 ("Nervousness is a common and entirely natural reaction to police presence . . . ."). Instead, it was a "strong reaction" that only occurred when Bissonnette asked Belin if he was carrying anything. Belin's demeanor and facial expression changed, he took a deep breath, and then his breathing became quick and shallow. He looked around "as if searching for a means of escape." This type of nervousness could contribute to the suspicion that Belin was both armed and dangerous. See Arnott, 758 F.3d at 45 (extreme nervousness relevant to reasonable suspicion that defendant was armed and dangerous); Ivery, 427 F.3d at 73-74 (same); Gilliard, 847 F.2d at 25 (same); United States v. Villaneuva, 15 F.3d 197, 199 (1st Cir. 1994) (same). And he was wearing clothes that precluded the officer from visually confirming the absence of a firearm. See Villaneuva, 15 F.3d at 199 ("While defendant's clothing was in current style, and so could not affirmatively be held against him, its capacity for concealment was not irrelevant." (citation omitted)). Viewed collectively, these factors gave rise to a reasonable suspicion that Belin was again unlawfully in possession of a firearm. And, as we have said, a person who is unlawfully armed and unusually nervous is reasonably viewed as dangerous enough to justify a frisk to locate and remove the weapon. We therefore affirm the denial of Belin's motion to suppress.

We consider next Belin's challenge to the district court's decision to allow him to make certain choices in the conduct of his defense.  For the following reasons, we find no reversible error in the court's patient management of Belin's rights and demands.

**A.**[6]

A few weeks before trial, Belin's experienced and capable attorney, Paul Garrity, moved to withdraw.  At an initial ex parte hearing on that motion, Garrity explained that he filed the motion because Belin disagreed with the way Garrity wanted to defend against the charge.  Garrity considered the lines of defense that he had proposed to be the only "semi-plausible" defenses available and stated that, without them, Belin would have "no defense."  When given the opportunity to address the court, Belin quickly revealed that Garrity planned "to say that the gun was planted on [him] or that maybe [he] didn't know that [he] had the gun on [him]."  Belin stated that he was "never going to agree with any lawyer saying that at [his] trial."  The district court

_____

[6] This recitation of the facts draws from the transcripts of two hearings (which occurred on December 11, 2014 and December 18, 2014) that were sealed by the district court and included in a Sealed Supplemental Appendix on appeal.  We now order those transcripts, and the appendix that contains them, unsealed after the parties, in response to a show cause order, agreed that there is no longer any reason for them to remain sealed.

told Belin that he had "the right to control the defense" and to "instruct [his] attorney not to make a particular argument," but that he also had to cooperate with his attorney. The district court warned Belin that if he did not cooperate, the court would allow Garrity to withdraw and would not appoint a new attorney, since Garrity was Belin's third court-appointed lawyer. Garrity objected to the conclusion that Belin had the right to tell him not to make these arguments. He insisted that he had the right to make "strategic decisions."

After inviting the prosecutor back into the courtroom, the district court warned Belin about the risks of representing himself. In particular, the court emphasized that Belin faced a mandatory minimum sentence of fifteen years in prison,[7] that the rules of evidence and criminal procedure are technical and would not be relaxed for his benefit, and that "a trained lawyer would defend [him] far better than [he] could defend [him]self." During these warnings, Belin stated on three different occasions that he would not cooperate with Garrity if Garrity insisted on arguing that the firearm was planted or Belin did not know about it. At one point, he specified that the reason he did not want Garrity to make these arguments is because "that's not what happened."

---

[7] The prosecutor had represented that Belin was subject to a fifteen-year mandatory minimum sentence pursuant to the Armed Career Criminal Act, see 18 U.S.C. § 924(e), which proved not to be the case.

At a second ex parte hearing, the issue arose again. Garrity stated that it had not been resolved because the defense Belin wanted him to present "would be frivolous and would lead to a guaranteed conviction." Garrity once again challenged the district court's ruling that Belin could instruct him not to pursue his preferred lines of defense. Belin once again insisted that he would not go along with Garrity's proposed lines of defense because they relied on facts that were not true. The district court acknowledged that the question was difficult but decided not to change its earlier ruling. It reasoned that this choice was somewhere between the large-scale determinations, such as whether to plead guilty, that are reserved for the defendant and the small-scale decisions, such as what questions to ask, that are reserved for counsel. The district court considered it a matter of common sense that an attorney could not overrule his client and "put on a defense that the client feels is unsupportable." The district court also questioned why a defendant should be allowed to forego all available defenses by pleading guilty but not some available defenses at trial. The district court therefore ordered Garrity to stay in the case and do as Belin instructed because any other attorney the court appointed would face the same problem.

The district court then spoke again with Belin in order to ensure that Belin understood the consequences of waiving these lines of defense. After the colloquy, the district court found

that "the defendant has knowingly waived, []voluntarily[8] waived his right under the Sixth Amendment to have counsel raise or suggest two factual issues in order to try to raise reasonable doubts in the minds of the jury, those two factual issues being, first[,] that the gun may have been planted on Mr. Belin, and, second, that Mr. Belin did not know that the gun was on him at the time he was arrested."

**B.**

There is a threshold issue about how to characterize what occurred in this case. The district court initially treated its ruling that Belin could instruct his attorney to forgo two lines of defense as a partial waiver of Belin's right to counsel, conducted a colloquy, and found that Belin knowingly and voluntarily engaged in this partial waiver. When a criminal defendant waives counsel, but only in part, we call this a "hybrid representation." United States v. Nivica, 887 F.2d 1110, 1120 (1st Cir. 1989). The district court later revised its view of what it had done, stating that it had not created a "hybrid representation," but had simply allowed Belin to direct his defense. On appeal, Belin continues to characterize his relationship with counsel in the wake of the district court's

---

[8] The transcript says "involuntarily." It is clear from context that either the district court misspoke or a transcription error occurred. Belin does not argue otherwise.

- 20 -

ruling as a hybrid representation. The government does not challenge that characterization. With the parties thus aligned, we will assume (without deciding) that the effect of the district court's ruling was not simply to define the extent to which a fully represented defendant may direct actions of counsel. Rather, we will assume (again without deciding) that the district court created a hybrid representation, which is to say that it accepted a waiver of the right to counsel on a portion of the defense.[9]

This court has held that a partial waiver of the right to counsel requires that the trial court satisfy the same standard that applies to a complete waiver of the right to counsel. See Maynard v. Meachum, 545 F.2d 273, 277 (1st Cir. 1976). The defendant must waive his right to counsel with unequivocal language. See United States v. Jones, 778 F.3d 375, 389 (1st Cir. 2015). Even if the defendant has done so, the waiver must also be knowing and intelligent. See United States v. Robinson, 753 F.3d 31, 43 (1st Cir. 2014). A knowing and intelligent waiver of the right to counsel requires the defendant to have understood "the magnitude of the undertaking and the disadvantages of self-

---

[9] Because we decide the issue on this ground, we do not address the parties' arguments about what the Rules of Professional Conduct require of a defense attorney in this situation. Whatever these rules require, Belin agrees that we may affirm the district court if he "was fully apprised of his right to counsel and of the disadvantages he might encounter by limiting the information his counsel could present."

representation," as well as "the seriousness of the charge and of the penalties he may be exposed to." Id. (quoting Maynard, 545 F.2d at 279). Our standard for reviewing the adequacy of such a warning, called a Faretta warning after Faretta v. California, 422 U.S. 806, 835 (1975), is effectively de novo: "[T]he efficacy of the court's Faretta warning must be evaluated on the basis of the record as a whole." Jones, 778 F.3d at 389. "We will uphold a waiver of the right to counsel as long as the record supports a reasoned conclusion that the defendant was fully apprised of his right to counsel and of the disadvantages he would encounter should he elect to proceed pro se." Id. "[W]here the court's Faretta warning is less thorough than it might be, we may nevertheless affirm a district court's decision to allow a defendant to proceed pro se if 'the record amply supports the lower court's conclusion that [the defendant] was fully aware of the disadvantages he would face as a pro se defendant.'" Robinson, 753 F.3d at 44 (second alteration in original) (quoting United States v. Francois, 715 F.3d 21, 30 (1st Cir. 2013)).

Belin argues that the warning he received was inadequate because the district court did not explain: (1) why trial counsel thought the rejected defenses were Belin's best chance of acquittal; (2) that trial counsel was in a better position to decide how to defend against the charge than the defendant; and (3) that some parts of trial are confusing to a lay person and

Belin might not understand the full consequences of his decision. These contentions are not supported by the record.

Belin was made abundantly aware why his attorney thought the rejected defenses provided the best chance of acquittal and that the likely consequence of rejecting the defenses was conviction. At the hearings before the district court, defense counsel stated on a number of different occasions that the defenses he was proposing were Belin's only available defenses, that not using them would lead to a "guaranteed conviction," and that Belin's preferred defense was "not a defense." Before Belin was under oath, the court warned him, "Mr. Garrity thinks that it may make it more likely you'll be convicted if you don't pursue a plant defense or suggest that you didn't know the gun was on you. He thinks that that increases the likelihood the jury will convict you, so there's some danger in it." During the Faretta warnings, the district court explained that Belin would not be guilty of the crime if the gun were planted on him or if he did not "knowingly control[] it." The court ensured Belin understood that his attorney thought that the rejected strategies "would be an important part of representing [Belin] effectively at trial," that "if he does not put on those factual defenses, in his judgment [Belin is] more likely to be convicted by the jury," and that the consequences of forgoing the defenses included "the possibility

- 23 -

that it may be more likely that [Belin would be] convicted by the jury at the end of the day."

The district court also made clear to Belin that defense counsel had better knowledge of the law than did Belin. At the first ex parte hearing, when the court went through a colloquy with the defendant in anticipation of the possibility that the defendant would be defending himself, the court warned Belin, "It's unwise of you to represent yourself despite your experience. You're not sufficiently familiar with the law or with court procedure or the rules of evidence to properly represent yourself, and I strongly urge you to cooperate with your lawyer going forward and to not try to represent yourself." The district court hit on this same theme at the second ex parte hearing, noting that "[w]hat the lawyer brings to the table is, of course, the legal knowledge and training and skill and so forth." Finally, the district court told Belin that he was "facing a mandatory minimum sentence of 15 years in prison and a possible maximum sentence of life."

These warnings adequately apprised Belin that some parts of trial are confusing to a lay person and that Belin might not understand the full consequences of his decision. Moreover, Belin engaged with the district court during the colloquy and asked for clarification on multiple occasions. Belin asked about the reasons his attorney believed the proposed lines of defense would be helpful, what it would mean to waive those defenses, as well as

- 24 -

other questions about his trial rights. The district court emphasized that Belin did not bear the burden of proof, and that his attorney proposed the waived lines of defense as ways of creating reasonable doubt in the minds of the jurors. The second ex parte hearing ended with Belin stating that he had no other questions for the district court.

These warnings adequately informed Belin of his attorney's superior legal knowledge, the seriousness of the charge, the penalties he may be exposed to, and the disadvantages of forgoing the lines of defense his attorney recommended. We also acknowledge much common sense in the district court's observation that Belin had the right to plead guilty if he wanted. He also had a right to testify and admit that no gun was planted on him or to insist on a trial even if he had no defense. See Florida v. Nixon, 543 U.S. 175, 187 (2004) ("A defendant . . . has 'the ultimate authority' to determine 'whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.'" (quoting Jones v. Barnes, 463 U.S. 745, 751 (1983))). By securing an order that relieved his counsel of any obligation or ability to press lines of defense predicated on what Belin deemed to be falsehoods, Belin likely did little more than he would have done had he exercised those rights. But cf. Nixon, 543 U.S. at 178 (holding that it was not ineffective assistance for defense counsel to decide, without defendant's approval, to concede guilt during

- 25 -

liability phase of first-degree murder trial); Jones, 463 U.S. at 751 (holding that it was not ineffective assistance for appellate counsel to decline to make every nonfrivolous argument requested by the defendant).  In any event, even assuming that the district court effectively ordered a hybrid representation, it did so after conducting an adequate colloquy sufficient to allow Belin to exercise his right to waive counsel.

## III.

For the foregoing reasons, we affirm Belin's conviction.