Filed 4/7/21  P. v. Hernandez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059028 |
| v. | (Super. Ct. No. 18NF1411) |
| BENITO MIRANDA HERNANDEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Robert Alan Knox, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Benito Miranda Hernandez was convicted of possessing and transporting for sale a large amount of methamphetamine that was seized from his mother's car during a traffic stop. Hernandez, a passenger in the car at the time of the stop, contends the seizure violated the Fourth Amendment because it was the product of an unduly prolonged detention. He also contends his attorney was ineffective for not objecting to his post-arrest confession, and the trial court prejudicially erred in failing to consider his poor mental health as a mitigating factor at sentencing. We reject these contentions and affirm the judgment.

FACTS

On the afternoon of May 11, 2018, CHP Officer Samuel Garcia stopped a Toyota Camry on a roadway in Anaheim because its windows were unlawfully tinted. Garcia contacted the driver, Sarah Ventura, and noticed appellant in the front passenger seat. Garcia informed Ventura he pulled her over because her windows were too dark. He then asked for her driver's license, registration and proof of insurance. While Ventura was retrieving her license, which was issued in Arizona, appellant volunteered that the car belonged to his mother.

Garcia had Ventura step outside and ushered her to the rear of the car. After receiving assurances from her she was not in possession of any weapons, Garcia asked her why she was driving with an Arizona license. Ventura said she had arrived here from Arizona about three weeks earlier and did not have a California license. She also said appellant was her roommate, and they were on their way to Starbucks when Garcia pulled them over. Asked where she and appellant were coming from, Ventura said "mechanic work" in the area.

Garcia told Ventura to sit on the curb and then contacted appellant, who was still sitting in the Camry. While they were talking, appellant reiterated the car belonged to his mother. He said he had a driver's license, but had left it at his mother's house while he was doing mechanical work there. Asked about Ventura, appellant said

2

she was his girlfriend, and they had been living together at his nearby residence for five months.  He said they were coming from there and were on their way to visit one of his friends when Garcia stopped them – answers that conflicted with Ventura's.

Garcia had appellant step out of the car and patted him down for weapons.  Finding none, he directed appellant take a seat on the curb next to Ventura.  Both of them seemed very nervous.  According to Garcia, appellant was not only breathing heavily, his chest was visibly contracting and expanding "at a higher rate than normal."

Garcia asked appellant for his name, address and date of birth, which appellant provided.  Then he asked appellant if he knew his driver's license number.  Appellant provided two numbers.  The first one did not come up in Garcia's computer system, but the second one did, confirming appellant was a licensed driver.

By that time, CHP Officer Richard Cheever had arrived on the scene, along with his drug-sniffing dog Nero.  Garcia asked appellant if he could search the Camry, and appellant balked, saying it wasn't his car.  At that point, Garcia told him, "So something doesn't make sense, okay?  So, what's gonna happen is . . . I'm gonna have the dog . . . take a look at the car [and] if you guys are good, then you guys [will] be on [your] way."

With that, Cheever walked Nero around the Camry, and the dog promptly alerted for drugs near the driver's window, which was open.  Cheever then let Nero off his leash, and he jumped through the window and laid down on a large black trash bag in the back seat.  After that, Cheever entered the car, looked in the bag and discovered it was loaded with one-pound bags of methamphetamine.  He also found a backpack in the backseat that contained methamphetamine, a pistol and ammunition for the gun.  Still more methamphetamine, along with several packages of fentanyl, was found in the trunk of the vehicle.  All told, the police recovered about 49 pounds of methamphetamine from the car.  At no point did they issue Ventura a citation for driving with unlawfully tinted windows or give any indication they intended to do so.

Following appellant's arrest, Narcotics Detective Steven Cuevas interviewed him at the scene. Appellant said the drugs in the Camry belonged to him, not Ventura. He also signed a written confession to that effect and directed the police to $10,000 in cash that was inside the glove compartment of Ventura's car.

Appellant was charged with multiple drug and weapon offenses. Before trial, he moved to suppress the contraband that was found in the Camry on Fourth Amendment grounds. (Pen. Code, § 1538.5.) Among other things, appellant argued the contraband was seized during an unduly prolonged traffic stop. Following an evidentiary hearing, the trial court denied appellant's motion without making any factual findings or explaining the basis for its decision. The case then proceeded to trial. Although the jury acquitted appellant of two charges related to the fentanyl, it convicted him of possessing and transporting methamphetamine for sale and found he possessed more than 20 kilograms of the drug. During the course of the proceedings, appellant also pleaded guilty to two gun-related charges. The trial court sentenced him to prison for 18 years and 8 months for his crimes.

DISCUSSION

*Fourth Amendment Claim*

Appellant contends the trial court erred in denying his suppression motion. In his view, the purpose of the traffic stop was already over by the time Nero alerted on the Camry, and therefore the alert and subsequent car search resulted from an unduly prolonged detention. The Attorney General does not dispute Nero's alert came after Garcia had completed his duties with respect to the underlying traffic stop. However, he argues the alert and car search were lawful because independent reasonable suspicion developed during the course of the stop. We agree with the Attorney General and uphold the trial court's decision to deny appellant's motion to suppress.

The parameters of a lawful traffic stop were delineated in *Rodriguez v. United States* (2015) 575 U.S. 348. In that case, the high court made clear that upon

4

initiating a traffic stop, an officer has the authority "to address the traffic violation that warranted the stop . . . and attend to related safety concerns [citation]." (*Id*. at p. 354.) In so doing, the officer may examine the driver's license, check for outstanding warrants, and inspect the car's registration and insurance. (*Id*. at p. 355.) The officer may also require the driver and any passengers to exit the car. (*Id*. at p. 356.) However, the officer generally may not engage in activities unrelated to the purpose of the stop, such as bringing in a drug-sniffing dog to detect evidence of ordinary criminal activity. (*Id*. at pp. 355-356.) Therefore, once the officer's duties related to the stop are complete, he may not prolong the detention by initiating a dog sniff unless he has independent reasonable suspicion to believe that criminal activity is afoot. (*Id*. at pp. 354-357.)

Here, it is undisputed that Garcia's duties attendant to the traffic stop were over when he determined appellant had a valid driver's license. At that point, which was roughly 11 minutes into the stop, there was no justification for Garcia to extend the stop for the purpose of addressing the underlying traffic violation. However, instead of terminating the detention at that juncture, Garcia asked for appellant's consent to search and initiated a dog sniff, which extended the stop another five and a half minutes before Nero alerted on the Camry. The question we must decide is whether Garcia had independent reasonable suspicion of criminal activity so as to warrant this fairly brief – but constitutionally significant – extension.

Reasonable suspicion is a flexible concept: "it deals with degrees of likelihood, not with certainties or near certainties." (*United States v. Arnott* (1st Cir. 2014) 758 F.3d 40, 44.) "The focus is on what a reasonable officer, armed with the same knowledge, would have thought. [Citation.]" (*United States v. Arthur* (2014) 764 F.3d 92, 97.) While there must be "some objective manifestation" that criminal activity is afoot (*United States v. Cortez* (1981) 449 U.S. 411, 417 & fn. 2), due deference must be given to the officer's ability to formulate "commonsense conclusions about human behavior[.]" (*Id.* at p. 418.) We must also remember that the facts must be assessed in

5

their totality, not in isolation from one another, and that "'[t]he possibility of an innocent explanation [for the defendant's actions] does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of [police] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . .' [Citation.]" (*People v. Souza* (1994) 9 Cal.4th 224, 230, 233.)

The record shows that by the time Garcia finished questioning appellant and Ventura at the scene of the stop, he suspected something was amiss, which is why he initiated the dog sniff. While Garcia didn't use the phrase "reasonable suspicion" – he simply told appellant and Ventura "something doesn't make sense" – we believe he had just cause to extend the stop for the purpose of allowing Nero to sniff around the Camry.

Several factors inform our decision in that regard. For starters, neither appellant nor Ventura owned the Camry or had a California driver's license in their possession. Nor was there an explanation of why Ventura would be driving appellant's mother's car. Although Garcia was eventually able to confirm that the car belonged to appellant's mother and that appellant was licensed to drive in California, the circumstances confronting Garcia from the inception of the stop were somewhat unusual.

Moreover, appellant and Ventura gave conflicting answers to very simple questions that Garcia asked them, such as where they were going and where they were coming from. They also couldn't agree on how long Ventura had been in California, or what the nature of their relationship was. While there was nothing facially incriminating about their answers, it is well established that "lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion." (*United States v. Simpson* (10th Cir. 2010) 609 F.3d 1140, 1149.)

Garcia also noticed that appellant and Ventura were both very nervous during the stop. Even though nervousness in the presence of the police is not uncommon, appellant was so anxious that it noticeably affected his breathing, which Garcia described

6

as fast and heavy. This elevated the level of suspicion surrounding the situation from a Fourth Amendment prospective. (*In re H.M.* (2008) 167 Cal.App.4th 136, 144.)

In arguing otherwise, appellant contends Garcia was not qualified to draw any inferences about his labored breathing because he was not familiar with how he normally breathes, when he is not being detained by the police. However, Garcia's testimony about appellant's excessive nervousness, which was based on his first-hand observations of appellant's physical condition, constitutes permissible lay opinion that we may properly consider in deciding the lawfulness of Garcia's actions. (See *United States v. Sandobal* (9th Cir. 2001) 1 Fed.Appx. 735; Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2020) ¶ 8:668 [the scope of permissible lay opinion includes testimony that another person looked nervous].)

In deciding that issue, it is also significant that Ventura was driving with an Arizona driver's license, even though California law requires drivers to obtain a California license within 10 days of establishing residency in the state. (See Veh. Code, §§ 12500, subd. (a); 12505, subd. (c).) Standing alone, the fact Ventura was in violation of this requirement obviously does not constitute reasonable suspicion of independent criminal activity. However, driving with an out-of-state license is a relevant consideration in determining whether a traffic stop may be lawfully extended beyond the underlying purpose of the stop. (See, e.g., *State v. Stack* (La.App. 2011) 2011 WL 2616861 [officer had reasonable suspicion to extend traffic stop where the defendant produced an out-of-state driver's license, exhibited nervous behavior and provided inconsistent answers to the officer's questions].)

Considering all of the circumstances known to Garcia, we are convinced there was reasonable suspicion for him to detain appellant and Ventura until the drug-sniffing dog alerted on their car. After that, the officers had probable cause to lawfully search the vehicle, and therefore their decision to do so did not violate the Fourth

Amendment.  (*People v. Stillwell* (2011) 197 Cal.App.4th 996, 1006.)  Thus, the trial court properly denied appellant's motion to suppress the fruits of that search.

*Sixth Amendment/Miranda Issue*

Appellant also contends his trial lawyer was ineffective for not objecting to his post-arrest confession pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  We disagree.

The Sixth Amendment affords criminal defendants the right to effective assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) However, "'[t]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel.' [Citation.]  If, as here, the record fails to show why counsel failed to object, the claim of ineffective assistance must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation." (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

At trial, the prosecution introduced appellant's post-arrest statements through the testimony of Detective Cuevas.  Here is what the detective said with respect to the issuance of appellant's *Miranda* rights:

"[Prosecutor]:  So when you initially started talking to [appellant at the scene], after you told him who you were, was the first thing you did was read him his rights?

"[Cuevas]:  After I introduced myself, yes.

"[Prosecutor]:  Okay.  And those rights are known as the what kind of rights?

"[Cuevas]:  Miranda.

"[Prosecutor]:  And when you did it, did you do it from memory or from a card?

"[Cuevas]:  From a card.

8

"[Prosecutor]:  Do you always do it that way?

"[Cuevas]:  Yes, I do.

"[Prosecutor]:  And is it in English or in Spanish?

"[Cuevas]:  I have both.

"[Prosecutor]:  Okay.  And basically tell us what it is you advised him.

"[Cuevas]:  I advised him of his right to remain silent, his right to an attorney, and if he willfully wants to make an admission of anything or speak, he has a right to stop at any time."

Appellant sees this exchange as proof positive that Cuevas did not read him an integral part of his *Miranda* rights, namely that he had the right to an *appointed* attorney *before* questioning.  (See *Miranda, supra,* 384 U.S. at p. 479 [prior to custodial interrogation, the police must inform a suspect, inter alia, that he has the right to have an attorney present during questioning, and if he cannot afford an attorney, one will be appointed to him free of charge].)  However, appellant fails to recognize how the prosecutor phrased his questions on this topic.  The prosecutor did not ask Cuevas to recite the complete admonishment he gave appellant.  Rather, he simply asked Cuevas for the gist of what he told appellant.  The prosecutor also elicited the fact that Cuevas admonished appellant using the same card he always uses to advise suspects of their *Miranda* rights.

On this record, defense counsel could have reasonably expected the prosecution would have been able to meet a *Miranda* objection by having Cuevas explain exactly what he told appellant in regard to his *Miranda* rights, or by having him recite the contents of his *Miranda* card.  Either way, defense counsel's failure to object on the basis of *Miranda* is not grounds for reversal.

*Sentencing*

Lastly, appellant contends the trial court erred by failing to consider his service-related mental health issues as a mitigating factor at sentencing.  Respondent

9

concedes the error but argues it was harmless given appellant's extensive criminal record and his actions in the present case. We agree with respondent.

This case was not appellant's first brush with the law. His prior convictions include abducting a victim at gunpoint, brandishing a firearm and multiple drug offenses. At sentencing, the trial court cited appellant's extensive criminal record as an aggravating circumstance. The court also found it significant that appellant had previously been incarcerated and performed poorly on probation and parole. In addition, the court found the circumstances regarding appellant's present crimes were aggravated, in that he was caught transporting a large amount of drugs with a gun in his car. This signaled to the court that appellant was not simply a minor player in the illegal drug trade.

On the other side of the equation, the court was impressed by the fact that appellant admitted guilt at an early stage of the proceedings. Although appellant took his case all the way to trial, he confessed on the scene to possessing the drugs that were found in his mother's car, and he led the police to a large amount of cash in Ventura's car. The court also recognized appellant had served three years in the Navy, during which time he was deployed to Afghanistan on multiple occasions. However, while acknowledging appellant's military service left him with emotional trauma and PTSD, the court did not believe those mental issues reduced his culpability in the present case.

Alas, after finding no unique circumstances warranting a grant of probation, the court sentenced appellant to an aggregate prison term of 18 years and 8 months, calculated as follows: The midterm of three years for transporting methamphetamine for sale; concurrent and stayed two-year terms for possessing methamphetamine for sale and illegally possessing ammunition; a concurrent term of eight months for possessing a firearm as a felon; and a mandatory 15-year enhancement for possessing over 20 kilograms of methamphetamine.

The law is clear. Pursuant to Penal Code sections 1170.9 and 1170.91, the trial court is required "to consider a criminal defendant's qualifying service-related

10

conditions [including PTSD] as mitigating circumstances in making discretionary sentencing choices." (*People v. Panozo* (2021) 59 Cal.App.5th 825, 831.)   Thus, it was error for the trial court not to consider appellant's service-related PTSD and emotional trauma as mitigating factors in imposing sentence.

Still, even if the court had done so, it is not reasonably probable appellant would have received a more favorable sentence because he was presumptively ineligible for probation, and the number of factors in aggravation cited by the trial court – eight in all – was simply overwhelming.  (See *People v. Davis* (1995) 10 Cal.4th 463, 552 [the reasonable probability standard of harmless error review applies to alleged sentencing errors].)  Indeed, the record shows appellant has a history of committing gun and drug-related crimes, thus proving his serious conduct in the present case was no aberration. Therefore, the court's sentencing error was manifestly harmless.  (Compare *People v. Burney* (1981) 115 Cal.App.3d 497, 504–506 [trial court's failure to consider all applicable mitigating factors warranted a remand for resentencing where the number of mitigating factors was roughly equal to the number of aggravating ones].)

DISPOSITION

The judgment is affirmed.



BEDSWORTH, ACTING P. J.

WE CONCUR:



MOORE, J.



IKOLA, J.

11