# United States Court of Appeals
## For the First Circuit

No. 22-1067

UNITED STATES OF AMERICA,

Appellee,

v.

FRANCIS HARRINGTON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Mary June Ciresi for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom
Jane E. Young, United States Attorney, was on brief, for appellee.

December 28, 2022

**GELPÍ**, **Circuit Judge**.    Following an anonymous tip alerting the Manchester Police Department of two men passed out in a vehicle, Francis Harrington ("Harrington"), the passenger, was stopped, pat-frisked, and arrested after the discovery of fentanyl in his waistband.    A federal grand jury in the District of New Hampshire returned an indictment charging him with one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi).    Harrington filed a motion to suppress the fentanyl, arguing that it was discovered during an unconstitutional stop and search.    The district court held a suppression hearing and denied Harrington's motion.    Harrington filed for reconsideration, and a second hearing was held, but the motion was again denied.    Harrington pled guilty to the indictment but reserved his right to appeal the district court's denial of his motion to suppress.    He now appeals.    We affirm the denial.

## I. BACKGROUND

### A. Facts

When "reviewing the denial of a motion to suppress, '[w]e recount the relevant facts as the trial court found them, consistent with record support,'" United States v. Romain, 393 F.3d 63, 66 (1st Cir. 2004) (alteration in original) (quoting United States v. Lee, 317 F.3d 26, 30 (1st Cir. 2003)), and "[w]e view the facts in the light most favorable to the district court's

ruling," United States v. Soares, 521 F.3d 117, 118 (1st Cir. 2008) (quoting United States v. Kimball, 25 F.3d 1, 3 (1st Cir. 1994)).

On the morning of August 22, 2019, an anonymous caller reported witnessing two males exit and return to a vehicle (a Chevrolet Impala) parked across the street from the Red Arrow Diner at 61 Lowell Street, Manchester, New Hampshire, and proceed to pass out in the vehicle. The area was commercial with a few apartments nearby and recognized as a high-volume area for crime and drug activity.

In response to the anonymous tip, Officer James Pittman ("Officer Pittman"), who had been working for the Manchester Police Department in New Hampshire for six years, arrived on the scene, parked behind the vehicle, approached the driver's side, and saw the driver sleeping or passed out with his head down and his chin resting on his chest. About thirty seconds later, medical personnel arrived. Officer Pittman woke up the driver but did not recall whether he did so by speaking to him or knocking on the window. When the driver awoke, he seemed lethargic with bloodshot eyes. Officer Pittman asked him to step out of the vehicle and realized he had pinpoint pupils that looked "a little bit glassy." Officer Pittman inferred that the driver was under the influence of opioids or other narcotics. He conducted a pat-frisk and spoke to the driver, who denied illegal activity and impairment.

While speaking to the driver, Officer Pittman noted that medical personnel had engaged the passenger -- Harrington -- while he was still sitting in the vehicle. As Officer Pittman walked over, he observed one of the medical professionals gesture that Harrington was not acting normal. Officer Pittman noted that Harrington appeared lethargic, his eyes were half shut at one point, and he was swaying from side to side. When Officer Pittman asked him to step out of the vehicle, Harrington reached around inside the Chevrolet Impala, including reaching between the seats near the center console area. Once Harrington finally exited, he continued to appear lethargic and moved very slowly.

Once Harrington was out of the vehicle, Officer Pittman requested that he place his hands on top of his head. Harrington placed one hand over his head but moved the other toward his pocket. Officer Pittman immediately grabbed his noncompliant arm and placed it on top of his head to prevent him from reaching into his pocket and began a pat-frisk. As Officer Pittman ran his hand over the front of Harrington's waistband, he felt a large bulge that he believed to be a weapon. He asked Harrington to identify the object, and Harrington stated, "drugs." Officer Pittman handcuffed Harrington and removed the bulge, which appeared to be a large bag containing four brown baggies and a brownish-tan substance. Based on his training and experience, Officer Pittman believed the substance to be either fentanyl or heroin. Harrington

was placed under arrest. The state lab later confirmed that the substance consisted of both fentanyl and heroin.

## B. Procedural History

Harrington moved to suppress the narcotics. The District Court for the District of New Hampshire held two hearings to determine whether the evidence should be suppressed -- one on August 25, 2020, and a reconsideration hearing on April 22, 2021 -- but denied Harrington's motion both times. Ultimately, the district court concluded that the investigatory stop did not violate Harrington's Fourth Amendment rights; that Officer Pittman had reasonable suspicion of criminal activity to extend Harrington's seizure after he and the driver regained consciousness; that Officer Pittman's decision to order Harrington out of the vehicle was justified; and that Officer Pittman had reasonable suspicion that Harrington could have been armed with a weapon to justify a Terry frisk. United States v. Harrington, 557 F. Supp. 3d 323, 326-27 (D.N.H. 2021). On May 18, 2021, Harrington pled guilty to the federal indictment and reserved his right to appeal the denial of his motion to suppress.

## C. Standard of Review

When reviewing a district court's denial of a motion to suppress, we assess factual findings for clear error and evaluate legal issues de novo. United States v. Tiru-Plaza, 766 F.3d 111, 114-15 (1st Cir. 2014). "In assessing these legal conclusions,

- 5 -

however, we also give appropriate weight to the inferences drawn by the district court and the on-scene officers, recognizing that they possess the advantage of immediacy and familiarity with the witnesses and events." Id. at 115. Moreover, we will uphold a denial of a motion to suppress "provided that any reasonable view of the evidence supports the decision." United States v. Ferreras, 192 F.3d 5, 10 (1st Cir. 1999). We note that "when two or more legitimate interpretations of the evidence exist, the factfinder's choice between them cannot be deemed clearly erroneous," United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007), and that "we are not wed to the district court's reasoning but, rather, may affirm its suppression rulings on any basis apparent in the record," United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014).

## II. DISCUSSION

On appeal, Harrington makes three challenges to the district court's denial of his motion. First, he argues that "[t]he initial stop was an unlawful detention." Second, he argues that Officer Pittman impermissibly prolonged the duration of the stop. Finally, he argues that Officer Pittman did not have reasonable suspicion to believe he was armed and dangerous, which Officer Pittman needed, to conduct a pat-frisk. To assess these challenges, we must evaluate whether reasonable suspicion existed to support Officer Pittman's conduct at each juncture of the encounter. We assess each in turn. We note that neither party

challenges the district court's findings of fact and, accordingly, we find no clear error.

## A. The Initial Encounter

Although the car was already stopped and parked, both Harrington and the government have argued that this encounter should be evaluated under the standards established in Terry v. Ohio, 392 U.S. 1 (1968), and we accept the agreed-upon mode of analysis.

First, Harrington argues that the initial stop violated the Fourth Amendment, contending that as soon as Officer Pittman observed that the "two men were conscious," "his wellness check should have ceased" because "[t]he act of sitting or sleeping inside a car is not an illegal act." Moreover, he claims that for the investigation to continue, Officer Pittman "needed reasonable suspicion that criminal activity was afoot," which he did not have. We disagree.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Evidence obtained in violation of the Fourth Amendment is subject to exclusion. Weeks v. United States, 232 U.S. 383 (1914) (adopting exclusionary rule); Mapp v. Ohio, 367 U.S. 643 (1961) (applying exclusionary rule to the states); United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011). "The protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief

investigatory stops generally known as Terry stops." Camacho, 661 F.3d at 724. A Terry stop is a brief detention that permits a police officer to, "in appropriate circumstances and in an appropriate manner[,] approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry, 392 U.S. at 22.

For a Terry stop to comply with the Fourth Amendment, the officer must have "reasonable suspicion that the person is or has been engaged in criminal activity." United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011). This assessment is based on the "totality of the circumstances," which requires that the detaining officer have a "'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). That is, while the standard is less demanding than that of probable cause, "the officer nonetheless must possess (and be able to articulate) more than a hunch, an intuition, or a desultory inkling of possible criminal activity." Romain, 393 F.3d at 71 (citing Terry, 392 U.S. at 27). "[T]he officer's subjective motives do not enter into the decisional calculus." Id. at 74 (citing Whren v. United States, 517 U.S. 806, 812 (1996)). Instead, this objective standard asks courts to "focus not on what the officer himself believed but, rather, on what a reasonable officer in his position would have thought." Espinoza,

490 F.3d at 47 (citing Romain, 393 F.3d at 74). Nevertheless, "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 418).

With these principles in mind, we ask whether given the totality of the circumstances, a reasonable officer in Officer Pittman's position would have had reasonable suspicion -- that is, a particularized and objective basis grounded in specific and articulable facts -- that Harrington was involved in criminal activity. In other words, whether a reasonable officer would possess more than a mere "hunch," more than a "desultory inkling," that crime was afoot. Romain, 393 F.3d at 71. We agree with the district court's conclusion that an officer would.

Officer Pittman had more than a "hunch" that criminal activity was taking place given the totality of the circumstances. Using and possessing illegal substances constitute criminal activity. N.H. Rev. Stat. Ann. § 318-B:2 (West 2022); 21 U.S.C. § 844. Officer Pittman was alerted via a phone call that two men were passed out at 8:30 a.m. on a weekday morning in a parked vehicle; observed two men passed out or sleeping in the vehicle identified in the phone call at an unusual time; knew that the vehicle was parked in a high-crime area known for illegal drug

use; observed that the driver appeared lethargic and had bloodshot, glassy, pinpoint eyes; and noted that there was no smell of alcohol or marijuana, indicating that such behavior could be attributed to illegal drug use rather than a legal substance.

Taken together, these facts indicate more than a mere "inkling," Romain, 393 F.3d at 71, that criminal activity was afoot, given the unusual time of day for a nap, the peculiarity of individuals napping on a weekday, the reality that the area was known for high drug use, and the obvious signs of drug impairment. Thus, we would be hard-pressed to conclude that a reasonable officer in Officer Pittman's position would not suspect illegal drug use in this context.

While Harrington argues that sleeping may not, on its own, give rise to reasonable suspicion, "our task is not to perform a 'divide-and-conquer analysis'" but "to look at the totality of the circumstances." United States v. Cruz-Rivera, 14 F.4th 32, 45 (1st Cir. 2021) (quoting Arvizu, 534 U.S. at 274). "[A] fact that is innocuous in itself may in combination with other innocuous facts take on added significance." United States v. Ruidíaz, 529 F.3d 25, 30 (1st Cir. 2008); see also Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (explaining that a Terry stop may be permissible even if "the conduct justifying the stop was ambiguous and susceptible of an innocent explanation"). Taken together with

the other facts described above, Harrington's conduct provided reasonable suspicion to justify the stop.

## B. The Length of the Stop

Harrington next argues that the stop was unlawfully prolonged, and that Officer Pittman had no basis to question him upon failing to find weapons on the driver. We disagree.

While it is true that even a lawful stop "can become unlawful" if it is unnecessarily lengthy, Illinois v. Caballes, 543 U.S. 405, 407 (2005), "there is no bright-line rule" to assess the duration of a stop, Tiru-Plaza, 766 F.3d at 117 (citing United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011)). Instead, the length of a stop is determined by the seizure's mission. United States v. Dion, 859 F.3d 114, 123-24 (1st Cir. 2017). We have recognized that "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." Id. at 125 (quoting Terry, 392 U.S. at 10).

Here, the district court properly concluded that "Officer Pittman was allowed to check on both the driver and passenger" before concluding the stop. Harrington, 557 F. Supp. 3d at 331. Officer Pittman's mission was to determine whether the occupants -- not occupant -- were possibly impaired or under the influence of illegal drugs, a concern which did not dissipate when both occupants awoke. Id. As the district court stated, using

and possessing illegal substances are crimes. 318-B:2; 21 U.S.C. § 844. After Officer Pittman investigated the driver, it only logically followed that he assess whether the other occupant -- Harrington -- was impaired.

Harrington argues that Officer Pittman lacked reasonable suspicion to investigate him both because the search of the driver did not confirm that the driver was engaged in illegal drug use, and because the frisk of the driver did not uncover any weapons. As to the former argument, reasonable suspicion does not require absolute certainty of illegal activity. See, e.g., Wardlow, 528 U.S. at 125. Officer Pittman noted that the driver was lethargic and had pinpoint, glassy eyes. That observation, if anything, added to the grounds for reasonable suspicion discussed above; it certainly did not diminish them. As to the latter argument, the fact that the driver did not possess any weapons has little bearing on whether a reasonable officer would suspect that Harrington was engaged in distinct criminal offenses involving drug use or possession.

**C. The Removal from the Vehicle and Pat-Frisk**

First, Harrington argues that Officer Pittman violated the Fourth Amendment by ordering him to exit the vehicle because Officer Pittman lacked reasonable suspicion, which is required to order someone out of a vehicle. We disagree. Here, the relevant moment for assessing whether reasonable suspicion existed is

immediately before Officer Pittman asked Harrington to step out of the vehicle, but Officer Pittman had reasonable suspicion at this juncture, as outlined supra. In fact, Officer Pittman had reasonable suspicion that crime was afoot even before this moment because he already had reasonable suspicion when he turned his attention from the driver to Harrington. Officer Pittman's subsequent interaction with Harrington (wherein Harrington appeared lethargic), which occurred immediately before ordering him out of the vehicle, only increased Officer Pittman's reasonable suspicion. Thus, it was permissible for Officer Pittman to order Harrington out of the vehicle on those grounds. United States v. Taylor, 511 F.3d 87, 92 (1st Cir. 2007) (analyzing whether there was "sufficient reasonable suspicion to justify [an officer's] decision to order [a defendant] to step out of [a parked] car").

Second, Harrington argues that Officer Pittman lacked reasonable suspicion to believe that he was armed and dangerous. We do not agree. We are careful to make this decision on the totality of the circumstances and hold that Officer Pittman's frisk was supported by objective and particularized facts sufficient to give rise to reasonable suspicion that Harrington was armed and dangerous.

The Fourth Amendment protects against warrantless searches and seizures, subject to limited established exceptions. One of these exceptions is a Terry pat-frisk. Terry held that

when an officer "observes unusual conduct which leads him reasonably to conclude . . . that criminal activity may be afoot" and that the defendant is "armed and presently dangerous," the officer may engage in a "limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault [the officer]." 392 U.S. at 30. Such weapons can include "guns, knives, clubs or other hidden instruments." Id. at 29.

To determine whether a pat-frisk for weapons is appropriate, we ask whether the investigatory stop was valid and whether "the officer is justified in believing that the person is armed and dangerous to the officer or others." United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005). Having concluded that Officer Pittman had reasonable suspicion that criminal activity -- illegal drug use and possession -- was occurring, we address whether Officer Pittman had reasonable suspicion that Harrington was armed and dangerous such that a pat-frisk would be permissible.

The reasonable suspicion standard for the pat-frisk is the same as that for the initial stop except it focuses on whether the individual is "armed and dangerous." Id. Thus, whether Officer Pittman's suspicions were reasonable is a "fact-sensitive task" which looks at the totality of the circumstances to determine whether there is a particularized, objective basis to suspect someone is armed and dangerous. United States v. Chhien, 266 F.3d

- 14 -

1, 8 (1st Cir. 2005).  A "mosaic" of factors may be used to justify reasonable suspicion, Ornelas v. United States, 517 U.S. 690, 698 (1996), including the suspect's behavior, the context of the stop, and the crime rate in the area, Wardlow, 528 U.S. at 124-25.  The standard is objective -- the arresting officer's subjective intent is irrelevant.  Tiru-Plaza, 766 F.3d at 116.

Harrington argues that Officer Pittman lacked reasonable suspicion to believe he was armed and dangerous because of his weakened state -- he "was acting lethargic, swaying from side to side and appeared to be reaching around."  Further, he was not "belligerent," "angry," or "resisting arrest."

Objectively, the facts before us give rise to reasonable concern for officer safety.  We begin with the facts known to Officer Pittman -- whom the district court found credible -- prior to the pat-frisk.  See Florida v. J.L., 529 U.S. 266, 271 (2000) ("[R]easonableness of official suspicion must be measured by what the officers knew before they conducted their search.").  Officer Pittman had observed multiple indications that Harrington was under the influence of drugs, as discussed above.  See United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005) (noting connection between drug transactions and weapons); Arnott, 758 F.3d at 45 (same).  Further, when Officer Pittman asked Harrington to step out of the vehicle, he delayed exiting and reached around inside the vehicle, near the center console area.  Once out of the

vehicle, Officer Pittman instructed Harrington to place his hands on top of his head, but while Harrington placed one hand over his head, he moved the other toward his pocket. Finally, Officer Pittman knew that he was responding to a call in an area known for high drug use. Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," police can consider the "relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Wardlow, 528 U.S. at 124. Additionally, the Supreme Court has stated that an "officer need not be absolutely certain that the individual is armed" to conduct a pat-frisk. Terry, 392 U.S. at 27.

Thus, by the time of the pat-frisk, a reasonable officer could point to "specific and articulable facts, which taken together with rational inferences from those facts," would reasonably warrant the pat-frisk given fear for officer safety. Id. at 21. Namely, the observation of two men passed out; the location of the vehicle in a high-crime area; the clear signs of opioid impairment; and, most notably, Harrington's reaches for something inside the vehicle, his noncompliance when asked to place both hands on top of his head, and his reach toward his pocket. These facts, and, in particular, Harrington's noncompliance on

- 16 -

more than one occasion, combined with the common association between drug transactions and weapons gave the police reason to suspect the presence of a traditional weapon as contemplated by Terry. See, e.g., Bustos-Torres, 396 F.3d at 943 ("Because weapons and violence were frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction."). When taken together, these facts support a reasonable suspicion that Harrington was armed and dangerous.

Harrington claims that Officer Pittman testified that he did not believe that Harrington was armed with a "firearm, knife, or other type of projectile weapon,"[1] and thus could not have believed Harrington was armed and dangerous. However, this argument misconstrues the reasonable suspicion standard. The test

---

[1] The government argues that beyond these objective facts, we should acknowledge that Officer Pittman also had a subjective fear that Harrington might have a hypodermic needle which he could use to stab him or medical personnel. The government urges us to hold that a hypodermic needle qualifies as a weapon under Terry. While some courts have concluded that a needle may be considered a weapon for purposes of Terry, we need not decide that issue in this case. See, e.g., United States v. Rush, No. 15-CR-105, 2015 WL 4364669, at *4 (D. Minn. Jul. 13, 2015) ("The limited pat-down search for needles was permissible under Terry to ensure officer safety, since the hypodermic needles could easily be used as weapons."); United States v. Gillespie, 2006 WL 533774, at *2 (E.D. Tenn. Mar. 3, 2006) (finding that an officer's efforts to ensure he would not be stuck with a needle were reasonable). Instead, we find sufficient objective facts to conclude that a reasonable officer would suspect that Harrington possessed one of the traditional weapons already covered by our Terry jurisprudence.

- 17 -

is objective, asking whether a reasonable officer in Officer Pittman's shoes would have believed Harrington was armed and dangerous, not whether Officer Pittman himself believed Harrington was armed and dangerous. Espinoza, 490 F.3d at 47 (citing Romain, 393 F.3d at 74). Even though Officer Pittman did not believe Harrington had one of the weapons he described, a reasonable officer would have had this suspicion given the relationship between drug transactions and firearms; the circumstances in which Harrington was found; and the fact that Harrington reached around in his car and toward his pocket while Officer Pittman was speaking with him. See Arnott, 758 F.3d at 45 ("The connection between drugs and violence is, of course, legendry."); United States v. Dubose, 579 F.3d 117, 122 (1st Cir. 2009) (holding, among other things, that a pat-frisk search was valid including because "drug dealers often carry weapons concealed in their waistbands"); United States v. Trullo, 809 F.2d 108, 113 (1st Cir. 1987) (affirming the validity of a pat-frisk noting that "concealed weapons [are] part and parcel for the drug trade").

Moreover, our holding is in line with our decision in McKoy. There, we held that the officer lacked reasonable suspicion to pat-frisk the defendant after he was stopped in a high-crime area for a parking and license plate violation and leaned toward the center console as the officer approached, since there is "nothing sinister or menacing" about this movement as it is

"consistent with reaching for a driver's license or registration."
Id. at 40. Unlike in McKoy, we do not have a traffic stop for
parking and license violations and a single abnormal movement on
the part of the defendant. Rather we have a stop prompted by a
phone call suggesting drug use in an area known for such use,
observations by an officer of symptoms of use of opiates, an
individual reaching for something near the center console after
being asked to step out of the vehicle, and noncompliance after
the individual is instructed to place both hands over his head.
When taken together, this abnormal behavior would lead a reasonable
officer to believe an individual is armed and dangerous.

Harrington further argued at oral argument that a
reasonable officer could not have considered him armed and
dangerous because of his debilitated state. Harrington would have
us hold that his swaying from side to side and lethargic behavior
ameliorated any legitimate concern that he posed a danger.
However, as the district court stated, "persons suspected of drug
use often exhibit unpredictable changes in behavior or erratic
behavior." Harrington, 557 F. Supp. 3d at 334. At this point in
the stop, it would be reasonable for an officer to suspect that
Harrington was under the influence of opiates and consequently,
that he may engage in impulsive behavior.

Finally, we note that we are careful to cabin our holding
to the facts of this case and in particular, the totality of the

circumstances -- including the high-crime area, the anonymous tip, obvious signs of drug impairment, the relationship between drug transactions and traditional weapons, the reach toward the center console, and the reach toward his pocket -- as required by our Fourth Amendment jurisprudence.

### III. CONCLUSION

Thus, we conclude that because Officer Pittman had reasonable suspicion for the initial encounter, for extending the stop, and to believe Harrington was armed and dangerous, there was no Fourth Amendment violation to warrant exclusion of the evidence. We thus **<u>affirm</u>** the denial of Harrington's motion to suppress.