# United States Court of Appeals
## For the First Circuit

No. 22-1111

UNITED STATES OF AMERICA,

Appellee,

v.

YOLANDA HOWARD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Kayatta, Gelpí, and Montecalvo,
Circuit Judges.

Robert C. Andrews for appellant.
Brian S. Kleinbord, Assistant United States Attorney, with
whom Darcie N. McElwee, United States Attorney, was on brief for
appellee.

April 19, 2023

**GELPÍ, Circuit Judge.** Defendant-Appellant Yolanda Howard ("Howard") was a passenger in a single-vehicle car crash on the Maine Turnpike. Maine State Police Troopers responded and became suspicious that the vehicle or its occupants were transporting drugs. After a search of Howard's bag revealed suspected narcotics, troopers placed her under arrest for possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1). Following the district court's denial of Howard's motion to suppress the drug evidence, she pled guilty. Because we conclude that Howard's initial encounter with police was not a traffic stop, that any subsequent seizure of Howard -- if one occurred at all -- was supported by reasonable suspicion, and that she voluntarily consented to the search of her bag, we affirm.

## I. Background

## A. Facts

When reviewing the denial of a motion to suppress, "we take the facts from the district court's decision and from the suppression hearing, presenting them in the light most compatible with the district court's ruling." United States v. Dion, 859 F.3d 114, 118 (1st Cir. 2017).

At approximately 7:01 a.m.[1] on February 28, 2019, Maine State Police Trooper Lee Vanadestine ("Trooper Vanadestine") was working a patrol shift on the Maine Turnpike. While traveling northbound, he observed that a vehicle -- approximately 100 feet off the right side of the road -- had crashed into a snowbank and that four people were standing around it. The crash site was miles away from the nearest exit or service plaza. Trooper Vanadestine activated his emergency lights and pulled over to assess the scene and check whether anyone was hurt. Around this same time, he radioed dispatch about the crash and requested a tow truck. As he exited his vehicle, three individuals approached him, however, the fourth -- later identified as Howard -- walked through the snow in the opposite direction.

After speaking with the three individuals that approached him, Trooper Vanadestine learned that one was a witness, who observed the vehicle go off the road, and that the other two (a male and a female), along with Howard, were occupants of the crashed vehicle. Trooper Vanadestine determined that the female, Jacqueline Paulson ("Paulson"), was the driver of the crashed vehicle and that the male, Beau Cornish ("Cornish"), was a

---

[1] Trooper Vanadestine testified that he approached the crash around 6:50 a.m., however, the video from his dashboard camera -- that he testified is dated and timed correctly -- begins at 7:01 a.m. We rely on the video's timing in our recitation of the facts and subsequent discussion.

passenger. Based on his initial conversation with Paulson and Cornish, Trooper Vanadestine believed that their stories about where they were coming from and heading to were not lining up and observed that they were acting like they did not know one another. While Trooper Vanadestine spoke with Paulson and Cornish, Howard avoided the group, remaining approximately fifty feet away from Trooper Vanadestine. She also never attempted to speak with him. Around 7:05 a.m., Howard, who was talking on her phone, walked into the roadway at least twice in what Trooper Vanadestine believed was an attempt to read the road signs. He instructed her to stay out of the roadway for her own safety.

At approximately 7:06 a.m., Trooper Anthony Keim ("Trooper Keim") arrived on scene to assist Trooper Vanadestine. The two troopers questioned and checked the identifications of the vehicle's occupants, as well as Paulson's registration and insurance information. Cornish told Trooper Vanadestine during their initial conversation that his name was Levi Veno but provided no identification. Around 7:07 a.m., the troopers spoke with Paulson, who produced a Maine driver's license but was unable to provide registration or insurance information for the vehicle. Paulson told the troopers that the group was on a trip, that she knew the passengers, that the female was her friend, and that the male's name was Levi. At around 7:08 a.m., Trooper Keim spoke with Howard, who produced a New York identification card and told

him that the group was traveling from New York. She identified the driver of the vehicle as Casey and could not provide information about the male passenger other than telling Trooper Keim that he was the driver's boyfriend.

While Trooper Keim spoke with Howard, Trooper Vanadestine contacted Maine State Police Sergeant Thomas Pappas ("Sergeant Pappas") to inform him that he suspected the vehicle or its occupants carried drugs. During the call, Trooper Vanadestine explained that the occupants appeared to not know one another, where they were going, or where they were coming from. Trooper Keim approached Trooper Vanadestine while he was on the phone and expressed the same concern about the occupants not knowing one another. Trooper Vanadestine explained to Sergeant Pappas that the occupants claimed that they went to New York to pick up Howard, who had walked away in the snow when Trooper Vanadestine arrived and would not go near him. After the call concluded, at approximately 7:11 a.m., Trooper Keim ran the name Levi Veno and came back with a photograph and description that did not match the male passenger. Around 7:13 a.m., Trooper Keim confronted the male passenger, obtained his true name -- Beau Cornish -- and learned that Cornish potentially had warrants out for his arrest. At 7:14 a.m., Trooper Keim arrested Cornish, placed him in the front seat of his cruiser, and, at 7:20 a.m., confirmed that Cornish had outstanding warrants. During this same period of time,

Trooper Vanadestine observed Howard and Paulson standing together, talking, and trading cell phones back and forth.

Around 7:23 a.m., Trooper Vanadestine allowed Paulson to sit in his cruiser to get warm while he interviewed her because it was eight degrees outside. Before Paulson entered his cruiser, Trooper Vanadestine patted down her outer clothing to ensure that she did not have weapons. By this time, the troopers were aware that Howard had no warrants out for her arrest. Shortly thereafter, at 7:30 a.m., Trooper George Loder ("Trooper Loder") arrived at the scene. Because it was cold and Trooper Keim and Trooper Vanadestine's cruisers were occupied by Cornish and Paulson respectively, Trooper Keim asked Trooper Loder if Howard could sit in his cruiser to get warm. Trooper Loder agreed.

Unlike traditional police vehicles where the backseat is separated from the front seat by a cage or glass partition, the cruisers involved here are undivided. Per Maine State Police policy, troopers transport individuals in the front passenger seat of their cruisers. Anyone entering the front passenger seat area is patted down beforehand for officer safety, and individuals seated there may exit the cruiser through the front passenger side door, which has a functional interior handle.

At 7:33 a.m., as Trooper Loder cleared out his front seat, Trooper Keim beckoned over Howard, who was on the phone, to sit in the cruiser. At no point did the troopers tell Howard that

- 6 -

she had to get into the cruiser or that she was not free to leave. Trooper Keim testified that Howard appeared eager to get out of the cold. Before allowing her to sit, Trooper Keim asked whether he needed to be concerned about anything in the cloth, open-top bag that she was carrying and asked that she hand it to him. She handed over the bag, and he placed it in the back seat of Trooper Loder's car. Then, Trooper Loder conducted a limited pat down of her jacket pockets for safety purposes. By 7:34 a.m., Howard was seated in the front passenger seat of Trooper Loder's cruiser.

Around the same time that Howard entered the cruiser, Sergeant Pappas arrived and requested that Howard exit the vehicle so that a female trooper could conduct a full pat down. According to Pappas, a full pat down is required before a person enters a cruiser, even if they are not suspected of committing a crime, to ensure officer safety. Howard complied. Around the time that Howard exited the cruiser -- at approximately 7:35 a.m. -- the tow truck that Trooper Vanadestine requested finally arrived.

By 7:38 a.m., Trooper Jodell Wilkinson ("Trooper Wilkinson"), a female K9 officer, had arrived on scene and conducted the more thorough pat down of Howard's outer clothing. At approximately the same time, Sergeant Pappas informed Trooper Loder that Howard's bag should not be searched without her consent. At 7:39 a.m., after Howard was patted down, Sergeant Pappas asked her if the items in the back seat of Trooper Loder's cruiser

belonged to her and if troopers could go through the items quickly. Before she could reply, he asked, "Mind if we search those items?" Howard responded, "huh?" and Sergeant Pappas again asked, "Do you mind? Can we search the items?" Howard then responded affirmatively.[2] The district court found that Trooper Loder and Sergeant Pappas testified credibly that Howard said "yes" in response to Sergeant Pappas's question and both understood that she had consented to a search of her bag.

Before the search began, Sergeant Pappas told Howard, who was standing unrestrained near Trooper Loder's cruiser, that she could sit inside. Howard got back into the front passenger seat at 7:39 a.m. Once inside, she sat facing the rear seat and talked with Trooper Loder as he searched her bag. At 7:40 a.m., Howard told Trooper Loder that she had someone who was willing to come pick her up and he responded, "We'll talk about that if we get to that point." Around 7:44 a.m., Trooper Loder found what he believed to be bundles of narcotics inside Howard's bag. He alerted Sergeant Pappas, asked Howard to step out of the cruiser,

---

[2] Howard asserts that the exact words she used were, "I guess." However, the government claims that Howard replied, "Yes." The district court reviewed the audio recordings and found that, although they were not entirely clear, Howard's reply sounded closer to, "Yes, sir." We also reviewed the recordings and agree with the district court's finding. Nevertheless, the precise language Howard used is inconsequential since Howard does not contend on appeal that she did not consent to the search of her bag, just that said consent was involuntary.

placed her under arrest and in handcuffs, and then returned her to the cruiser.

## B. Procedural History

Howard was indicted for possession with intent to distribute a mixture or substance containing fentanyl, cocaine, and cocaine base, in violation of 21 U.S.C. § 841(a)(1). She moved to suppress the controlled substance that served as the basis for her indictment, arguing that troopers obtained the evidence in violation of her Fourth Amendment rights. The government opposed suppression, and the district court conducted an evidentiary hearing where five troopers testified and the government submitted video evidence. The district court ultimately denied Howard's motion, concluding that the troopers did not unlawfully prolong the accident investigation because they possessed reasonable articulable suspicion to request a drug sniff of the crashed vehicle and that Howard -- who was not in custody based on the totality of the circumstances -- voluntarily consented to the search of her bag. Following the denial of her motion, Howard conditionally pled guilty, reserving her right to appeal the district court's suppression decision.

## II. Standard of Review

We review factual findings in the district court's suppression decision for clear error. United States v. Tiru-Plaza, 766 F.3d 111, 114 (1st Cir. 2014). "A clear error exists only if,

- 9 -

after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made." United States v. Ferreras, 192 F.3d 5, 9-10 (1st Cir. 1999). Notably, "when two or more legitimate interpretations of the evidence exist, the factfinder's choice between them cannot be deemed clearly erroneous." United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007).

In contrast, we review the district court's legal conclusions de novo. Tiru-Plaza, 766 F.3d at 115. Ultimately, we will affirm the district court's denial of the suppression motion "provided that any reasonable view of the evidence supports the decision," Ferreras, 192 F.3d at 10, and in doing so, "we are not wed to the district court's reasoning but, rather, may affirm its suppression rulings on any basis apparent in the record," United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014).

**III. Discussion**

**A. The Initial Encounter**

Before we reach the merits of Howard's argument that she was unlawfully detained, we find it necessary to outline some applicable Fourth Amendment principles.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A "seizure occurs when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" United

States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). Determining whether a seizure occurred is usually a fact specific inquiry, see, e.g., United States v. Tanguay, 918 F.3d 1, 5-8 (1st Cir. 2019), however, the Supreme Court has established that a motor vehicle stop for a traffic violation constitutes a Fourth Amendment seizure, Delaware v. Prouse, 440 U.S. 648, 653 (1979). When an unconstitutional seizure occurs, courts enforce the Fourth Amendment's proscription by excluding evidence obtained during said seizure. Camacho, 661 F.3d at 724 (explaining motions to suppress are premised upon the exclusionary rule).

Howard assumes, without discussion, that a valid Fourth Amendment traffic stop occurred when troopers arrived on scene to investigate the accident and therefore asserts that the relevant inquiry here is whether troopers were justified in prolonging the traffic stop and expanding its mission to investigate drug trafficking per Rodriguez v. United States, 575 U.S. 348 (2015). The district court used this analytical framework in deciding the motion to suppress, citing to Rodriguez and United States v. Orth, 873 F.3d 349 (1st Cir. 2017), both of which involved traffic stops. The government contends -- for the first time on appeal -- that Howard was not seized within the meaning of the Fourth Amendment when troopers responded to the crash because they did not conduct a traffic stop, and, in any event, the troopers were engaged in

community caretaking. Howard left the government's argument uncontradicted when she failed to file a reply brief. Noting that "[w]e are not committed to the district court's reasoning" in affirming the motion to suppress, see United States v. Cabrera-Polo, 376 F.3d 29, 31 (1st Cir. 2004), we conclude based on the facts before us that the encounter was not a traffic stop.

For a traffic stop to have taken place, Trooper Vanadestine would have had to seize the vehicle (pull it over) for a traffic infraction, but the record is clear that that did not take place here. Cf. United States v. Harrington, 56 F.4th 195, 200 (1st Cir. 2022) (evaluating an investigatory police encounter with occupants of a vehicle as a Terry stop, as opposed to a traffic stop, where the automobile was already stopped and parked before police approached); Espinoza, 490 F.3d at 48-49 (using Terry framework to evaluate whether agent approaching a vehicle amounted to a seizure where the agent "played no part in bringing the van to a halt"). Rather, while traveling the Maine Turnpike at the end of his shift, Trooper Vanadestine came upon a recently crashed vehicle, surmised that the occupants needed help, and pulled over to assist. Because no traffic stop occurred here, we need not employ the Rodriguez framework utilized by the district court.

But just because this was not a traditional traffic stop does not mean that a Terry stop -- a specific type of Fourth Amendment seizure -- did not occur when troopers arrived on scene.

We still must assess whether the circumstances rendered the initial encounter and questioning a seizure, and, if so, whether it was supported by the requisite level of suspicion or was otherwise permissible for a different reason, such as community caretaking. See United States v. Taylor, 511 F.3d 87, 91-92 (1st Cir. 2007) (evaluating whether a Terry stop resulted from police approaching a parked car); Espinoza, 490 F.3d at 48-49 (same).

The Fourth Amendment does not prevent "all contact between the police and the citizenry," United States v. Mendenhall, 446 U.S. 544, 553 (1980) (Stewart, J.), and no constitutional intrusion arises from police merely "approaching individuals on the street or in other public places and putting questions to them if they are willing to listen," United States v. Drayton, 536 U.S. 194, 200 (2002). A Terry stop is "a brief detention that permits a police officer to . . . 'approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'" Harrington, 56 F.4th at 201 (quoting Terry, 392 U.S. at 22). A Terry stop occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." Terry, 392 U.S. at 16. Such restraint, for this purpose, might be achieved "by means of physical force or a show of authority." See Mendenhall, 446 U.S. at 553; California v. Hodari D., 499 U.S. 621, 626 (1991) (requiring submission to show of authority to effect a seizure); see also United States v.

- 13 -

Fields, 823 F.3d 20, 25 (1st Cir. 2016). Thus, the relevant inquiry in deciding whether a seizure occurred is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." Mendenhall, 446 U.S. at 554; see Fields, 823 F.3d at 25. However, acknowledging that few people would ever feel truly free to walk away from police questioning, our inquiry into whether a seizure occurred -- which is highly fact specific -- asks whether the "police conduct, viewed from the totality of the circumstances, . . . objectively communicate[s] that the officer is exercising his or her official authority to restrain the individual's liberty of movement." United States v. Cardoza, 129 F.3d 6, 16 (1st Cir. 1997).

Turning back to the case before us, we conclude that, under the totality of the circumstances, the troopers' arrival on scene and initial accident response, which included speaking with the occupants about the crash and running identification checks, did not constitute a Terry stop. It is worth noting at the outset that Howard's presence on the highway "was restricted by a factor independent of police conduct" given that she was a passenger in a crashed vehicle. See Florida v. Bostick, 501 U.S. 429, 436 (1991); United States v. Smith, 423 F.3d 25, 30 (1st Cir. 2005) ("[M]ere physical limitations on an individual's movement, not created by police, are insufficient to turn an encounter with

- 14 -

police into a restraint of liberty.") The troopers did not put Howard on the highway or tell her that she could not leave. Thus, her presence on the highway was not on its own a seizure.

Nor did the troopers' actions during the initial accident response transform the encounter into a Terry stop where the evidence demonstrates that a reasonable person would have felt "free to decline the officers' [help] or otherwise terminate the encounter," and Howard herself did so during the initial part of the encounter. See Bostick, 501 U.S. at 436; United States v. Angulo-Fernandez, 53 F.3d 1177, 1179 (10th Cir. 1995) (concluding that an officer stopping to assist defendant with a stalled car was not a stop because defendant "could have declined the officer's assistance"); see also United States v. Himes, 25 F. App'x 727, 730 (10th Cir. 2001) (unpublished opinion) ("[W]hen an officer stops to help a disabled vehicle, the encounter is, at least in the beginning, consensual."). It is undisputed that while the other occupants approached Trooper Vanadestine when he arrived on scene, Howard distanced herself and made no effort to speak with him. Significantly, the troopers did not demand that Howard speak with them or do anything to "convey a message that compliance with their [offer of assistance was] required." Bostick, 501 U.S. at 429. In fact, prior to asking for Howard's identification, the only interaction Howard had with Trooper Vanadestine was when he instructed her to stay out of the roadway, the Maine Turnpike, for

- 15 -

her own safety. Given the limited nature of the trooper's command and Howard's ability to otherwise move about freely -- which she exercised by walking around the crash site from the moment Trooper Vanadestine arrived -- no reasonable person in Howard's position would have believed that the officer was "exercising his . . . official authority to restrain [her] liberty of movement" based off the trooper's request to stay out of the roadway. See Cardoza, 129 F.3d at 16.

While other factors -- such as the troopers' request for Howard's identification, use of emergency lights, and Trooper Keim's prompt arrival on scene -- could indicate that a seizure occurred during the initial accident response, when balanced against the totality of the circumstances, they do not compel a finding that the initial encounter here was a Terry stop. Our precedent establishes that "officers -- even without any basis for suspecting that an individual has committed a crime -- 'may generally ask questions of that individual [and] ask to examine the individual's identification . . . -- as long as the police do not convey a message that compliance with their requests is required.'" See Tanguay, 918 F.3d at 5 (quoting Bostick, 501 U.S. at 434-35). Absent evidence that the troopers demanded Howard's identification, their request is "the type of de minimis intrusion that we have long agreed to tolerate as a necessary part of

- 16 -

policing" and thus does not infringe the Fourth Amendment.  See id. at 7.

Nor does the use of emergency lights or Trooper Keim's mere arrival on scene demand the conclusion that Howard was seized pursuant to a Terry stop.  A reasonable person in Howard's shoes would likely infer that Trooper Vanadestine activated his emergency lights for safety reasons, given that he was stopped on the side of a busy highway, not "to indicate to [Howard] that [s]he should stop in [her] tracks."  See Cardoza, 129 F.3d at 16; cf. Tanguay, 918 F.3d at 8 (noting that police lights are usually construed by drivers as "a command to pull over").  Additionally, Trooper Keim's arrival on scene falls short of establishing the threatening police presence that would lead a reasonable person in Howard's position to believe that she could not leave.  Cf. United States v. Sierra-Ayala, 39 F.4th 1, 13 (1st Cir. 2022) (concluding that defendant was "clearly seized" when three officers arrived on scene, yelling "police," and additional police officers and vehicles arrived shortly thereafter, amounting to a "heavy police presence"); see Tanguay, 918 F.3d at 6-7 (noting that an "officer's status as a police officer will not itself transform otherwise innocuous conduct").  Given that the troopers never attempted to restrict Howard's movements (other than requesting that she stay out of the road), never prevented her from using her phone or told her that she could not leave, never touched Howard or their

- 17 -

weapons, and engaged with her in a non-threatening manner, see Tanguay, 918 F.3d at 7 (discussing absence of certain coercive factors), we conclude that the troopers' arrival on scene and initial questioning did not result in a Terry stop.[3]

Our next task would normally be to determine whether a seizure occurred at any point thereafter. But, because a seizure is constitutionally valid when preceded by reasonable suspicion, see id. at 4 (citing Arizona v. Johnson, 555 U.S. 323, 326 (2009)) (explaining that if reasonable suspicion existed before Terry stop, plaintiff's Fourth Amendment claim is extinguished), and because we conclude, infra, that reasonable suspicion arose before any even arguable seizure could have occurred, we assume without deciding that a seizure akin to a Terry stop took place as Howard's interaction with the troopers progressed.

---

[3] Because we conclude that Howard's initial encounter with troopers was not a Terry stop and that any subsequent seizure, if one occurred, was supported by reasonable suspicion, we need not address whether the troopers' actions were also permissible as reasonable community caretaking activities.

Further, although we conclude that Howard was not seized during the troopers' initial response to the crash, that is not to say that any roadside assistance by law enforcement is automatically a consensual encounter and not a Terry stop given that the analysis remains a "'highly fact specific' inquiry." See Tanguay, 918 F.3d at 6 (quoting Cardoza, 129 F.3d at 15). Accordingly, we are careful to cabin our holding to the facts of this case and note that different facts may compel a different conclusion than the one that we reach today.

- 18 -

Viewing the record in the light most favorable to the argument that a <u>Terry</u> stop occurred at some point during the encounter, the earliest time that a show of authority amounting to a seizure could plausibly have occurred was 7:14 a.m. -- when Trooper Keim placed Cornish under arrest. For purposes of this analysis, we assume without deciding that a <u>Terry</u> stop occurred at that point[4] and proceed to explain our conclusion that reasonable suspicion arose prior to the assumed seizure.

## B. Reasonable Suspicion

Before turning to Howard's contention that the troopers lacked reasonable suspicion to detain her, we outline some additional Fourth Amendment principles.

The Fourth Amendment's prohibition on "unreasonable searches and seizures," U.S. Const. amend. IV, applies to <u>Terry</u> stops, <u>Camacho</u>, 661 F.3d at 724. For a <u>Terry</u> stop to comply with the Fourth Amendment, a police officer must possess "reasonable, articulable suspicion of an individual's involvement in some criminal activity" at the inception of the stop, <u>Dion</u>, 859 F.3d at 124; see <u>Terry</u>, 392 U.S. at 21, and the "actions undertaken

---

[4] In response to questioning during oral argument, Howard suggested that a seizure may have occurred when Trooper Wilkinson patted down Howard for the second time or when Howard told Trooper Loder that she had someone who was willing to come pick her up and he responded, "We'll talk about that if we get to that point." Our discussion assumes a seizure occurred earlier than either of these reference points.

pursuant to that stop must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation,'" United States v. Ruidíaz, 529 F.3d 25, 28-29 (1st Cir. 2008) (quoting United States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006)); see Terry, 392 U.S. at 20.

Although less demanding than the probable cause standard, reasonable suspicion requires "more than a hunch, an intuition, or a desultory inkling of possible criminal activity." United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004). A reviewing court must consider whether, under the "totality of the circumstances," a police officer would have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). With these principles in mind, we turn to Howard's arguments.

Howard contends that the district court erred in concluding that troopers possessed reasonable suspicion of drug trafficking because (1) Trooper Vanadestine had nothing more than a hunch that criminal activity was afoot when he detained her and that any suspicion was not particularized to Howard, (2) that the district court applied a subjective officer view of the evidence instead of an objective one, and (3) that the district court should not have afforded any deference to Trooper Vanadestine's judgment because he impermissibly referenced Howard's race. We disagree.

The district court concluded, and we agree, that under the totality of the circumstances, troopers had more than a "hunch" that the vehicle or its occupants, particularly Howard, carried drugs from almost the outset of the encounter. While running identification checks and inquiring about the crash, troopers observed that the vehicle's occupants appeared not to know one another. Howard provided an incorrect name of "Casey" for the driver and could not identify the male passenger beyond saying that he was the driver's boyfriend. All of the individuals indicated that they were coming from New York, however, they provided vague or inconsistent responses to questions about their travel itinerary. Paulson lacked valid vehicle registration and insurance, and shortly thereafter, troopers learned that Cornish had provided a fake name and had outstanding warrants. Finally, Howard distanced herself from Trooper Vanadestine when he arrived on scene. While Paulson and Cornish approached him and were willing to talk, Howard walked away from him through the snow, despite it being eight degrees. When Howard walked towards the roadway, she avoided joining the group and never attempted to speak to Trooper Vanadestine.

While Howard argues that these facts are insufficient for reasonable suspicion, her contention lacks support. We have previously considered similar objective facts in concluding that reasonable suspicion of criminal activity existed. See, e.g.,

- 21 -

Dion, 859 F.3d at 125 (finding reasonable suspicion of drug trafficking based in part on defendant's implausible interstate travel story); United States v. Cruz-Rivera, 14 F.4th 32, 45 (1st Cir. 2021) (citing defendant's inconsistent answers to trooper's questions as supporting, in part, reasonable suspicion of drug activity); United States v. Hart, 674 F.3d 33, 39 (1st Cir. 2012) (noting that the defendant quickly moved away from police when they arrived on scene in reasonable suspicion analysis); Tiru-Plaza, 766 F.3d at 117 (finding reasonable suspicion based on failure to produce a license and a legible vehicle registration). While "any one of those facts, taken alone, might not have been sufficient to create reasonable suspicion," Ruidíaz, 529 F.3d at 30 (explaining that innocent facts taken in their totality can support reasonable suspicion), after considering them in the aggregate, we conclude that sufficient evidence existed to support the troopers' suspicions that the vehicle or one of its occupants, including Howard, carried drugs.

Significantly, troopers learned each of the facts supporting reasonable suspicion before 7:14 a.m., thus making the assumed seizure lawful. See Tanguay, 918 F.3d at 4 (stating that reasonable suspicion must arise prior to Terry stop to comply with the Fourth Amendment). By 7:09 a.m., troopers had observed Howard's movements, spoken with each occupant and determined that they appeared not to know one another and that their travel stories

were not lining up, and learned that Paulson lacked vehicle registration and insurance. By 7:13 a.m., Trooper Keim knew that Cornish had provided a false name and that he likely had outstanding warrants. Because troopers possessed reasonable suspicion prior to the time any arguable seizure could have occurred, Howard's claim must fail.

Next, Howard argues that the district court erred by adopting Trooper Vanadestine's subjective view of the situation instead of conducting an independent assessment of whether a reasonable officer in Trooper Vanadestine's shoes would have suspected drug trafficking. This argument too lacks merit. The district court correctly stated the law -- that reasonable suspicion requires "objective reasonableness in the totality of the circumstances" -- and properly applied it by disregarding evidence of Trooper Vandestine's subjective views, which we discuss infra. Further, the district court did not substitute Trooper Vanadestine's assessment of the situation for its own. The district court reviewed video evidence to confirm troopers' characterizations of the events and made independent factual findings. The court then listed each objective factor supporting troopers' drug trafficking suspicions and properly considered them in the aggregate, recognizing that each on its own might be insufficient. We find no error in the district court's statement of the law or application of the reasonable suspicion standard.

Finally, Howard points to the fact that while speaking with Sergeant Pappas, Trooper Vanadestine identified Howard by describing her race ("the Black girl [who] won't come next to me"). Howard argues that by identifying Howard in this manner, Trooper Vanadestine revealed a racial bias. Racial bias by a police officer could certainly provide a basis for challenging the reliability or credibility of an officer's testimony. But Howard does not challenge the accuracy of anything that Trooper Vanadestine reported observing. The court in turn found that what the officers heard and saw objectively gave rise to a reasonable suspicion. In short, any potential racial bias could not have played a causal role in determining what happened and whether reasonable suspicion existed. And the presence of any improper motive otherwise plays no role in a suppression motion. See Whren v. United States, 517 U.S. 806, 813 (1996); Ruidíaz, 529 F.3d at 29 (explaining that reasonable suspicion turns on objective criteria, not "an individual officer's subjective motives"). Thus, this argument also fails.

Having concluded that reasonable suspicion preceded Howard's assumed seizure, any detention of Howard -- if one occurred at all -- did not offend the Fourth Amendment and thus was lawful. As such, her argument for suppression based on unlawful detention fails.

- 24 -

## C. Consent to the Search

Having rejected Howard's unlawful detention argument, we now turn to the issue of Howard's consent to the search of her bag. Howard contends that, even if her seizure was lawful, the district court erred in finding that she voluntarily consented to the search because: (1) her personal characteristics (age, lack of criminal record, less than average intelligence) contradict a finding of voluntariness, (2) troopers did not advise Howard that she could refuse to consent, (3) she was in custody when she gave consent, and (4) she was coerced when troopers conditioned her ability to get warm on her consent to the search. The government counters that Howard's consent was voluntary because she was not in custody nor subject to coercion when she gave consent and that the facts pertaining to Howard's personal characteristics should be deemed waived because Howard raises them for the first time on appeal.

Whether Howard freely consented to the bag search is a question of fact, and accordingly, we review the district court's voluntariness finding for clear error. See Dion, 859 F.3d at 129. To decide "whether consent was voluntarily given, we look to the totality of circumstances, including the person's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.'" United States v. Ramdihall, 859 F.3d 80, 89 (1st Cir. 2017) (quoting United States v. Forbes, 181 F.3d 1, 6 (1st Cir.

1999)).  Also considered is "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances."  Id. (quoting Forbes, 181 F.3d at 6).

We first address Howard's argument that her consent was coerced in part because she was in custody.  As support for her contention, she cites the circumstances of her alleged detention and the presence on scene of five state troopers, including a K9 unit.  The district court disagreed, concluding that Howard was not in custody.  We find no error here.

Custody determinations present a "mixed question of law and fact," United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001) (quoting Thompson v. Keohane, 516 U.S. 99, 113 (1995)); thus, the district court's factual findings are reviewed for clear error, and "the ultimate conclusion whether a seizure is a de facto arrest" is reviewed de novo, United States v. Fornia-Castillo, 408 F.3d 52, 63 (1st Cir. 2005).  We have previously explained that "[a] valid investigatory stop may nevertheless escalate into custody . . . where the totality of the circumstances shows that a reasonable person would understand that he was being held to 'the degree associated with a formal arrest.'"  Id. (quoting Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam)).  Some of the factors that we consider in deciding whether the custody threshold has been crossed include "whether the suspect

was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. (quoting United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996)).

Here, the district court concluded that no reasonable person in Howard's shoes would believe that she was being held under circumstances akin to a formal arrest. We agree. Howard was never explicitly told that she was not free to leave, she was never physically restrained, she freely talked on her cell phone and walked around the crash site, and she was invited -- not ordered -- to sit in Trooper Loder's car. Notably, she sat in the front passenger seat of the cruiser -- as opposed to a traditional divided prisoner compartment -- and the door had a functional interior handle permitting her to step out at any time. The district court also found that although Howard was patted down before being allowed to sit in the cruiser, the pat downs did not convey the impression of formal arrest because they were conducted to ensure officer safety before Howard -- who was wearing bulky winter clothing -- was allowed to sit unrestrained in the cruiser. While the presence of five troopers is certainly relevant to the custody calculus, the situation must be viewed holistically under the totality of the circumstances. The district court's findings, which are not clearly erroneous, provide ample support for its

conclusion that Howard was not in custody, particularly given the respectful tone of the encounter and the neutral public setting. Cf. id. at 64-65 (concluding that defendant was not in custody despite being temporarily handcuffed and officer drawing gun); Trueber, 238 F.3d at 93-95 (holding that pat down of defendant for officer safety did not convert investigatory stop into de facto arrest). Thus, no error exists as to the district court's custody determination.

Howard also contends that her consent was coerced because troopers conditioned her ability to sit in the warm cruiser on her agreeing to the bag search, but she provides no support for her assertion. Moreover, her contention is belied by the district court's findings. The district court found that although Howard may have felt obliged to consent to a search of her bag before sitting in the cruiser, nothing about Sergeant Pappas's request created the impression that her ability to do so was conditioned on a search of her bag. We agree. The record is clear that Howard was seated in the cruiser, albeit briefly, before Trooper Wilkinson conducted the full pat down and Sergeant Pappas asked for consent to search her bag. Further, Sergeant Pappas stated both to Trooper Loder and to Howard herself that he wanted her patted down before she sat in the cruiser -- never mentioning a search of her bag. We find no clear error here.

Howard's final argument is that the district court erred in finding that her consent was voluntary under the totality of the circumstances. In support, Howard asserts that -- in addition to the coercive elements discussed above -- she was in her early twenties at the time of the search, she had graduated from high school but from a program for people with disabilities, she has less than average intelligence, she had very little experience with the criminal justice system, and troopers did not tell her that she could refuse to consent, nor was she aware that she could refuse. Notably, Howard failed to develop the facts pertaining to her age, intelligence, and education during the suppression hearing, and instead raises them for the first time on appeal. However, even if we were to consider Howard's newly proffered facts, they fail to convince us that the district court erred in its voluntariness finding.

Howard does not meaningfully discuss how her disability or intelligence level impacted her ability to consent. Nor does she explain why contact with law enforcement for only minor offenses is significant to whether her will was overborne. To the extent that Howard relies on the lack of a warning regarding her right to refuse consent, said fact is relevant but not dispositive. "We have repeatedly held that the failure to advise a defendant of his right to refuse consent does not automatically render such consent invalid." United States v. Jones, 523 F.3d 31, 38 (1st

Cir. 2008).  Here, the district court properly considered the totality of the circumstances -- including the lack of a warning, the presence of multiple troopers on scene, and the cold conditions -- before concluding that Howard voluntarily consented to the search of her bag.  We discern no clear error in the district court's finding, particularly given the lack of "evidence of coercive tactics," United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003); see Ramdihall, 859 F.3d at 89 (explaining that defendant bears the burden of establishing that the manner of detention precluded her free consent).  Accordingly, Howard's argument for suppression, premised upon her involuntary consent to the search of her bag, also fails.

## IV. Conclusion

For the foregoing reasons, we **affirm**.